In the matter of the application of PATSY PETAGNO for a writ of *habeas corpus* for the infant Donna Lee Piazza or Donna Lee Petagno.

[Decided September 18th, 1946.]

*Mr. Samuel E. Barison* (*Mr. Philip Barbash,* of counsel), for the prosecutor, Patsy Petagno.

*Mr. Archie Elkins,* for the respondent, Emilia Piazza.

VAN WINKLE, A. M.

(1) The writ of *habeas corpus* issued in this custody proceeding is not to result merely in either a termination or a continuance of the alleged restraint which, usually, is the function of such a writ. The writ brought the infant born out of wedlock on July 12th, 1944, to Helen Piazza, who was then nineteen years old, under the *parens patriæ* jurisdiction of this court and an issue of custody was thus raised. The writ may not be regarded as authorized by the provision respecting *habeas corpus* in the *Minors Act* (*R. S.* 9:2–7), for that relates to the bringing of "a child of the marriage" of "parents" before the court for an award of custody and orders relating to "access of either parent."

It does not matter how an infant is brought before this court for an award of custody. A writ of *habeas corpus* which

brings an infant before this court is merely ancillary to the jurisdiction of this court as *parens patriæ* to determine the custody of the infant. See *Ex parte Hoines,* 112 *Atl. Rep.* 613 (not in state reports), which cites *Baird* v. *Baird,* 19 *N. J. Eq.* 481; *Buckley* v. *Perrine,* 54 *N. J. Eq.* 285, 293; 34 *Atl. Rep.* 1054 *et seq.; Rossell* v. *Rossell,* 64 *N. J. Eq.* 21; *Hasselman* v. *Haas,* 71 *N. J. Eq.* 689; *Warnecke* v. *Lane,* 75 *Atl. Rep.* 233 (not in state reports); *Palmer* v. *Palmer,* 84 *N. J. Eq.* 550; *In re Anna Bell Malley* (1942), 131 *N. J. Eq.* 404; 132 *N. J. Eq.* 439; *Queen* v. *Nash* (1883), 10 *Q. B. D.* 454; 54 *L. J. Q. B.* 442; 13 *Eng. Ruling Cases* (at *p.* 26).

(2) The *parens patriæ* jurisdiction of this court comprises illegitimate infants and such jurisdiction has been exercised without question. *Simpson on Infants* (1875), 126-127. The leading case on the subject seems to be *Queen* v. *Nash, supra.* The House of Lords confirmed the jurisdiction of custody over illegitimate infants in *Barnado* v. *McHugh* (1891), *A. C.* 388; 61 *L. J., Q. B.* 721, where Halsbury, L. C., noted and commented that "Sir George Jessell pointed out in *Queen* v. *Nash* that the court is now governed by equitable rules, and that in equity regard was always had to the mother, the putative father, and the relatives on the mother's side. Natural relationship was thus looked to with a view to the benefit of the child. There is in such a case a sort of blood relationship which, though not legal, gives to natural relatives a right to the custody of the child * * *."

New Jersey cases: In *Hasselman* v. *Haas* (1906), *supra,* upon jurisdiction being invoked respecting the custody of an illegitimate infant, jurisdiction was taken without question although Vice-Chancellor Garrison expressly referred as his authority to *Rossell* v. *Rossell, supra,* which, however, was not a case involving an illegitimate infant. In *Baker* v. *Baker* (1912), 81 *N. J. Eq.* 135, Vice-Chancellor Howell in dealing with a *habeas corpus* proceeding for *access* to an illegitimate infant found the question to be one of new impression. But he noted that in the case of *Queen* v. *Nash, supra,* that Sir George Jessell had said that the question of custody of an illegitimate infant did not depend upon the mere legal rights

upon *habeas corpus* but upon equitable doctrines. *In re Malley, supra,* the jurisdiction of this court to settle the custody of an illegitimate infant was taken without question.

(3) Patsy Petagno averred that he is the father of the infant, and entitled to custody as against the maternal grandmother, in whose physical custody the infant was left by Helen when she went away in August, 1945; and the grandmother presently has physical custody. Helen has not been heard from since she left, and no witness on the hearing had heard from her or knew where she had gone or where she then was. So Helen was not available for the giving or compelling of direct testimony by her as to the paternity of the infant. However, Helen made declarations as to the paternity of the infant before and after its birth. The "Record of Birth" filed July 21st, 1944, with the Bureau of Vital Statistics of Hudson County, states that Helen Piazza, 19 years old, gave birth on July 12th, 1944, to a female child at the Margaret Hague Maternity Hospital, Jersey City, "Donna Lee Piazza—father's full name O. W." (meaning out of wedlock). On July 15th, 1944, the Hospital delivered "a Social Case History" to the Bureau of Municipal Relief, Jersey City, which reported the birth and stated: "Problem, unmarried, putative father, Joseph Brantley, address, Merchant Marine." The only source of the information contained in the birth certificate and the social case history was Helen herself.

The day after the birth a woman investigator connected with the Jersey City Poormaster's office talked to Helen at the hospital because the child had been officially reported as born out of wedlock. It was this woman's official duty, acting for the community, to ascertain the name of the father; and it was with that purpose that she went to the hospital to interview Helen. Helen then told the investigator that the father of the infant was "Joseph Brantley, a seaman, Merchant Marine, stationed somewhere in New York." She added that she did not have his address; that she had had illicit relations "with Joe around October 12th, 1943, at a hotel at Forty-fourth Street, New York;" that about two months later she had met him and told him that she was pregnant, whereupon he offered her a hundred dollars for an abortion, which she

refused. Helen did not mention Patsy Petagno at all to the investigator. This testimony of the investigator came in without objection.

One of Helen's sisters, a respectable married woman, to whom Helen was "the baby of the family," paid Helen's rent and bought her food and cared for her during the time of her pregnancy while she was living in furnished rooms and very sick and this sister supported her after the birth. Patsy Petagno was never mentioned by Helen to the sister during this period that Helen was living away from home because of her actions and her condition, nor did he appear. Helen's sister testified that she said to Helen, "Helen, you ought to look the father up," whereupon Helen told her that "the father was Joe Brantley;" and the sister testified that Helen added that "Joe was a nice fellow, was wounded, ship was torpedoed, was in the water a few days" * * * that he went to see her in the furnished room. The sister testified further that Helen said that she "was sorry for the fellow, it just happened," and that she said that she didn't know where Joe lived, "all I know is he has got a mother and sister. He doesn't want to get married, wait until war is over." And further the sister testified that after the birth of the infant Helen told her that Joe had sent her $50; and further, that after the birth Helen kept on writing to Joe; but she never gave anyone the address she wrote to. The sister's husband saw some of these letters of Helen to Joe. Apparently Helen was protecting Joe against prosecution. One of Helen's sisters testified that Helen gave Joe a snapshot of the baby and that Joe said the baby "looked like him." After Helen disappeared her sisters made inquiries in New York for Joe Brantley but because they did not have enough information about him nothing was learned.

If these declarations that have been received were in fact made by Helen as narrated by the investigator and by Helen's sister, then apparently Joseph Brantley is the father of the infant. There is no reason whatever to doubt the testimony of the Poormaster's investigator or that of Helen's sister that Helen made the declarations. This hearsay testimony, to call it that, was given without any objection except once how-

ever, there was an objection made by the counsel for Patsy Petagno, which, while indefinite, should in fairness be viewed I think as an objection that the testimony was hearsay. This objection related to what Helen had said to her sister about Joe Brantley being the father of the infant as hereinbefore recited. Counsel for Patsy Petagno after so objecting said something about "reserving" his right to move to strike out testimony, and this "right" was reserved to the extent that it could be legally reserved, but no such motion was made. I regarded the objection at the time it was made as being legally ineffective, and this for more than one reason. For one reason, Patsy Petagno, giving his testimony first in the order of proof, had himself given testimony of statements by Helen, which testimony had not been objected to. Moreover, in one view it is questionable I think whether Helen's declarations on paternity should be regarded as hearsay. In this child-custody proceeding should Helen, the mother of the infant, not be viewed as a party to the proceeding although not expressly so named by Patsy Petagno? It should be said here that without the testimony characterized as hearsay the hearing would have been but a skeleton. Despite my attitude toward the objection mentioned as I have indicated it I have not given the objected-to testimony any value in coming to my conclusions as to custody, so I need not discuss the objection that was made as stated.

(4) When hearsay evidence is admitted without objection it is to be considered and given its natural probative effect as if it were in law admissible. *Diaz* v. *United States*, 223 *U. S.* 442; 56 *U. S. L. Ed.* 500. Testimony received without objection, although hearsay, has the value of direct evidence if relevant to the issue. *Demos Co.* v. *Service S. Co.*, 34 *Atl. Rep.* (2d) 828; 153 *Pa. Sup.* 623. Where evidence incompetent as hearsay is admitted without objection and is relevant and material to the issue the court may give it the value of direct evidence. *Harrah* v. *Montour*, 321 *Pa.* 526; 184 *Atl. Rep.* 666. A rule of evidence not invoked is waived. 1 *Wigm.*, ¶ 18. Inadmissible evidence * * * including hearsay evidence admitted without objection is not a nullity or void of probative force but is to be given its natural pro-

bative effect as if it was in law admissible * * *. This is true even in a criminal case. *Poluski* v. *Glen Alden Coal Co.*, 286 *Pa.* 473; 133 *Atl. Rep.* 819. The reasons which exclude hearsay testimony are legal barriers which have been erected by the law, and which, in the interest of justice, the parties may move aside. *Ibid.* As Professor Edmund M. Morgan has said, "The truth is that the exclusionary rules of evidence and particularly the hearsay rule, are the results of the adversary system; in almost all jurisdictions they are enforced at the behest of the adversary."

It has been held almost universally that when hearsay testimony is admitted without objection it may properly be considered and given its natural probative effect as if it were in law admissible. The numerous out-of-state and substantially-unanimous decisions to this effect have been collected in 104 *A. L. R.* 1130. If counsel does not make timely objection that is the end of any prohibitory rule of evidence that might have been invoked. 1 *Wigm.* and *Suppl.*, ¶ 18. Objection or a motion to strike needs to be made at the time the testimony comes in. *Ibid.* A party relying upon a rule of evidence is to invoke it. Not only may a right to make an objection be expressly waived, but a waiver may be implied from failure to make the objection at the proper time. *Ibid.* Professor Wigmore states that, after all, "a motion to strike" is really only an "objection;" and in an endeavor to make this clear he used this language: "The term 'motion to strike out evidence' which *ought to have been objected to* at the time is merely another term for an objection and is governed by the rules as of the time of an objection." *Wigm. Suppl.*, ¶ 18 *note* 17. (The emphasis is Professor Wigmore's own.)

New Jersey cases: Where no objection is made hearsay evidence, like any other evidence, is to be considered and given the importance it deserves. *Smith* v. *Delaware Co.* (1902), 63 *N. J. Eq.* 93; *affirmed*, 64 *N. J. Eq.* 770. "There was however, no legal error because the objection to the first answer went merely to the ground of irrelevancy, but it certainly cannot be said that the testimony was irrelevant, although it may well have been incompetent as hearsay. This latter objection however, was not made." *State* v. *Krupin* (1924), 101 *N. J. Law* 228. The settled rule is that after

a question has been fully answered without objection from opposing counsel a motion to strike it out comes too late. *O'Brien* v. *Stager* (1925), 101 *N. J. Law* 526.

(5) Counsel for the grandmother of the infant contended that the declarations of Helen as to the paternity of the infant although hearsay should be admitted as "an exception to the hearsay rule" because she was "not presently available to testify;" and in support of his contention he cited *Morgan* v. *Susino Construction Co.* (*Supreme Court*, 1943), 130 *N. J. Law* 418; *affirmed*, 131 *N. J. Law* 329, the opinion in which case refers to 2 *Wigm. Ev.,* § 1492. The cited *Wigmore* sentence, namely, "It seems never to have been doubted that the declarations of the *parents themselves* * * * as to the child's legitimacy or illegitimacy are receivable," apparently has for its authority two old English cases and a dozen old decisions of courts of states other than New Jersey which are named in the *Wigmore* footnote. However, an examination of the reports of such of these cases as are available shows, as was to be expected, that in each case the declarant was dead. The *Third Edition of Wigm. Ev.* (1940) on the same head is to the same effect as the *First Edition,* with a reference to several added cases in which cases the declarant was dead. In *Morgan* v. *Susino* the court stated "The four requisites to be met before a declaration may be received under the so called pedigree exception," the first being, as stated by the court, "that the declaration must have been made by a person not presently available to testify." However, in this *Morgan* v. *Susino Case* the declarant was dead.

Thus we see that counsel for the grandmother has relied upon the *words* of Professor Wigmore and the *words* of the court in the *Morgan* v. *Susino Case* in support of his contention that the testimony of declarants who are alive but who are "not presently available to testify" may be received.

Consider, however, rule 503 of the Model Code of Evidence promulgated March 15th, 1942, by the American Law Institute, which would, if adopted by the courts, change the present common law as to the admissibility of hearsay declarations:

Evidence of a hearsay declaration is admissible, if the judge finds that the declarant

(a) is unavailable as a witness, or

(b) is present and subject to cross-examination.

Members of the bar know that this Model Code of Evidence came into existence because of the general dissatisfaction with much of the law of evidence and after extended discussions and the labors of many judges and practicing lawyers selected as well qualified by experience to declare rules of evidence that would make a proceeding in a court a really rational proceeding. The Code was promulgated with the purpose and in the hope that irrational rules of evidence would be liquidated by legislation or judicial decisions. Rule 503, sensibly, would permit evidence of a declarant who is unavailable to testify because she cannot be found, as in this proceeding.

· This proposed rule accepts as a ground of unavailability of the declarant any inability to secure his testimony not due to the fault or procurement of the proponent of the evidence. While we in New Jersey still follow the old English hearsay rule we should note that in England the Act of 1938 (*St.* 1938 *C. 28 Evidence*) is more liberal in some respects, than this proposed rule 503 of the Model Code of Evidence.

In the April, 1946, number of the *Harvard Law Review,* Professor Edmund M. Morgan declares—in continuation of what he had said in 1942 in the foreword to the Model Code of Evidence—that "A proper appreciation of the history of the hearsay rule, a searching analysis of its supposed rationality, and an examination of its exceptions, might well lead to its practical abolition."

I am constrained to state, after nearly fifty-six years of active experience in the courts, that the desirability of the adoption of rule 503 of the Model Code of Evidence in substitution for "the exception to the hearsay rule" to which it relates is not to be denied.

(6) When the infant was born on July 12th, 1944, Patsy Petagno was a married man who had been living separately since 1934 from his wife to whom he had been married in November, 1919. This wife divorced him for extreme cruelty, the final decree of divorce being entered on July 1st, 1944. The verified petition for divorce charged him with many acts of violence toward the wife over a long period and acts which involved and were against the welfare of the young child of

the marriage, a daughter who had become twenty-four years old at the time of the hearing of this *habeas corpus* proceeding. The poormaster was busy after the decree of divorce in compelling Patsy Petagno to pay the small weekly sum provided to be paid toward the support of the daughter. He denied much of the testimony given by the poormaster's representative and also much of the testimony given by a probation officer. It is clear that this denial-testimony was not mistakenly or carelessly given, but that Patsy Petagno endeavored deliberately to falsify.

Helen was interested in a young sailor from Cincinnati, Ohio. He and she had their pictures taken together in February, 1943, by Helen's brother-in-law who was home on a furlough. Apparently Helen corresponded with this sailor and his mother. She got a telegram from the sailor's mother, and went out to his home in Ohio in May, 1943; and it seems clear that she was out of the state from May until the end of August, 1943. Her sisters so testified. Patsy Petagno however testified that he had intercourse with Helen "in July, 1943." His testimony as to intercourse with Helen after that date is indefinite to say the least. He was married to Helen on July 15th, 1945, by or in the presence of the recorder of Hoboken.

A few days after Helen had been married to Patsy Petagno he appeared at her home as her husband to the surprise of her people. While living at that home, for a short period Helen and Patsy Petagno did not sleep together. Helen told one of her sisters that she and Patsy Petagno "got married with an understanding that they were not supposed to sleep with each other; all he wanted her was to keep house for him, and she married so she could have home of her own, do as she pleased."

Leaving the home of her parents Helen went to live with Patsy Petagno in furnished rooms in Hoboken, but that lasted only "about a week." Apparently because she refused to sleep with him there Patsy gave her a terrible beating, whereupon she went back to her mother's home at four o'clock in the morning with the baby, her "face beaten to a pulp, fractured nose, black eyes, bruises all over." At five o'clock that morning she was taken to the hospital in an ambulance. It was

testified that Patsy Petagno beat her so hard that he "fractured his hand" and "had it in a sling for about three months;" that he said "her head was so hard." Patsy Petagno did not deny that he had beaten Helen in the way stated.

The evidence being what it is, a question naturally arises, namely, Why did Patsy Petagno bring this proceeding? It was somewhat suggested during the hearings that he, probably nearly as old as the infant's grandmother, wanted to "show" his former wife that he is able to marry a young woman some thirty years his junior—several years younger than his daughter—and have a child. A surmise, and one suggested during the hearing—and a surmise that has persuasion when Patsy Petagno has been looked at, listened to and sized up—is that he thought that if he got custody of the infant that Helen, on learning of that, might be thus induced to come to him—for his physical enjoyment.

(7) I determine that the averment of Patsy Petagno that he is the father of the infant "Donna Lee Piazza" born to Helen Piazza has not been proved in this custody proceeding. On this determination we see that this proceeding turns out to be one where on the proofs neither the prosecutor nor the respondent is a parent of the infant. However, in this situation, this court's *parens patriæ* jurisdiction enables it to settle the custody of the infant. See *In re Williams* (1910), 77 *N. J. Eq.* 478.

(8) An application for custody of an infant, no matter by whom instituted or against whom prosecuted, is not an *inter partes* suit in the usual sense. No matter what process is employed by parties to a proceeding involving the custody of an infant to bring the infant before this court, and although parties claim rights to custody, they act but intermediately. They but serve to bring the infant before this court on an invocation of its *parens patriæ* jurisdiction for the welfare of the infant.

(9) I will advise that the custody of the infant be committed to the maternal grandmother Emillia Piazza.

Conceivably, Helen may appear; and having in mind the possibilities of the future I have advised an order, for the benefit and protection of the infant, directing that a transcript of the testimony be filed with the clerk.