F. W. AND P. W., PLAINTIFFS, v. D. S., DEFENDANT.

Superior Court of New Jersey
Chancery Division

Decided March 13, 1964.

*Mr. Herman W. Kapp* for plaintiffs.

*Mr. Charles B. Thatcher, Jr.* for defendant (*Messrs. Thatcher & Thatcher*, attorneys).

CONSODINE, J. C. C. (temporarily assigned). Plaintiff (former wife of defendant) and her husband seek the continuance of custody of an infant female child who has been in their uninterrupted custody since November 7, 1960, as against defendant, the father of the child. The child was born on June 6, 1960. Plaintiff and defendant had been divorced in September 1957. The custody of the child of that marriage was granted to plaintiff with right of visitation to defendant. Plaintiff subsequently married the coplaintiff here in November 1957.

Defendant after the divorce lived with a married and undivorced woman who bore him the infant female on June 6, 1960. The child's birth certificate listed the mother's husband as the father of the child. The mother of this child died five months (November 4, 1960) after her deliverance. Defendant then left the infant child with his former wife, their child, and her husband. Subsequently on May 18, 1962, defendant —now married—sought from plaintiff the custody of the child. Plaintiff refused. This action followed.

On December 7, 1961, prior to the marriage of defendant to his present wife, this defendant caused or participated in the filing of an action in the Union County Court to modify the birth certificate of the infant to his name.

In the verified complaint he stated that the infant "is in his care and custody."

No guardian *ad litem* was appointed to protect the rights of the infant, who could by virtue of this suit be declared illegitimate at the instigation of her alleged father and her legal father.

On December 14, 1961, after a hearing in which attorneys appeared for S. and for the legal father but without independent representation on behalf of the infant, an order was entered which illegitimatized the infant. The order recites: "and the Court being of the opinion that the appointment of a guardian ad litem to protect the interest of said minor * * * is not necessary." The minute sheet of the court reflects that only S. and the legal father were sworn at the

hearing. But see *In re Rogers*, 30 *N. J. Super.* 479, 485 (*App. Div.* 1954), certification denied, *Morristown Trust Co. v. Neeld*, 16 *N. J.* 193 (1954).

Plaintiffs in this action now move for summary judgment on the pleadings and the law. The only question is the right of the defendant (as to whom there is necessarily for the purpose of this motion an assumption that he is the father of the child) to the custody of the child as opposed to all others. The questions of abandonment of the child to plaintiffs and custody based on the best interest of the child are not here involved.

█ At common law an illegitimate child was said to be the child of nobody—*nullius filius*. 1 *Blackstone, Commentaries, p. 459*; 2 *Kent's Commentaries, p. 214*. See too, *Wright v. Wright*, 2 *Mass.* 109, 110 (*Sup. Jud. Ct.* 1806) ("the relative of no one"); *Friesner v. Symonds*, 46 *N. J. Eq.* 521 (*Prerog.* 1890), where, citing with approval the language of Chief Justice Parsons in the *Wright* case, Vice Ordinary Van Fleet stated at *p.* 527: "He is *nullius filius*—the son of no one." And in the *State Board of Child Welfare v. P. G. F.*, 57 *N. J. Super.* 370, 375 (*J. D. Rel. Ct.* 1959),

"* * * and therefore *filius populi, i. e.,* the child of the people * * *."

In *Friesner v. Symonds, supra,* it was held that an illegitimate child, on the death of its mother, becomes an orphan. Lord Kenyon, C. J., held in *Rex v. Soper*, 5 *Term R.* 278 (*K. B.* 1793), that the putative father of an illegitimate child had no right to the custody of it.

Over more than the past hundred years statutes in our and other states have sought first the protection of the public against a charge for support *vis a vis* liability imposed on the putative father therefor, and latterly the protection of the status of the illegitimate against "the slings and arrows of outrageous fortunes" that in history, in literature, and in life have been concomitant with that status. See generally, *Hammond v. Pennsylvania R. R. Co.*, 31 *N. J.* 244, 252 *et seq.*

*Ousset v. Euvrard,* 52 *A.* 1110 (*Ch.* 1902), followed the *Friesner* case by a dozen years. The court noted with respect to the rights of a putative father as to custody of his illegitimate child that

"The father has hardly any right at all of custody, if he has any at all which the law recognizes. His position is largely that of a stranger, an outsider, having no natural relation to the child or children."

*Splitdorf Electrical Co. v. King,* 90 *N. J. L.* 421 (*Sup. Ct.,* 1917), affirmed 92 *N. J. L.* 524 (*E. & A.* 1918), dealt with interpretation of the Workmen's Compensation Act, *N. J. S. A* 34:1-1 *et seq.,* as applicable to provide benefits for the illegitimate child of a daughter of a deceased workman. The court stated:

"* * * for at common law a bastard was *nullius filius,* and if not a child of anyone could not be a grandchild. Our statute permitting inheritance between a mother and her illegitimate child does not establish any relationship between such child and the parents of its mother, nor can such child inherit from the mother's ancestors, for, except as changed by the statute, the common law prevails." (at *p.* 422)

In *Fischer v. Meader,* 95 *N. J. L.* 59 (*Sup. Ct.,* 1920), the court summarily disposed of the status of the putative father:

"Whatever legal status John Fischer, the putative father and the other petitioner herein, may have enjoyed under the civil law by reason of his recent marriage to the mother, he occupied no recognized legal paternal status at common law or under our statute. 2 *Kent Com.* 218, 331; *Pamph. L.* 1913, *p.* 733." (at *p.* 60)

*Hammond v. Pennsylvania Railroad Co., supra,* had to do with the interpretation of the word "children," as used in the Federal Employers' Liability Act. It does not consider the question here pertinent. The opinion reviews the subject of illegitimacy and the legislative enactments thereon (31 *N. J.,* at *pp.* 251–253).

In *In re Petagno,* 24 *N. J. Misc.* 279, 48 *A.* 2d 909 (*Ch.* 1946), Advisory Master Van Winkle wrote:

"* * * But he [Vice Chancellor Howell in *Baker v. Baker*, 81 *N. J. Eq.* 135 (*Ch.* 1912), in dealing with a *habeas corpus* proceeding for visitation by the father with an illegitimate child] noted that in the case of *Queen v. Nash supra*, that Sir George Jessell had said that the question of custody of an illegitimate infant did not depend upon the mere legal rights upon *habeas corpus* but upon equitable doctrines." (at *pp.* 280–281)

The *Petagno* case had to do with a claim of paternity as a premise to custody. The court found that the petitioner had not proven that he was the father of the child.

In *Queen v. Nash*, 10 *Q. B. D.* 454, 54 *L. J. Q. B.* 442 (1883), the mother of an illegitimate child sought custody with her sister of the child who had been with strangers for the seven years of her life. The court held that the mother of an illegitimate infant has a natural right to its custody which will be regarded by the court. There Jessell, M.R., stated:

"* * * In the case of *Ex parte Knee*, [1 *B. & P. N. R.* 148 (1804)] before Sir James Mansfield, it was held that she had such a right [custody] unless ground was shown for displacing it. The Court is now governed by equitable rules, and in equity regard was always had to the mother, the putative father, and the relations on the mother's side. Natural relationship was thus looked to with a view to the benefit of the child. There is in such a case a sort of blood relationship, which, though not legal, gives the natural relations a right to the custody of the child." (at *p.* 456)

The case was decided on the principle of what was in the best interest of the child.

*Bernardo v. McHugh*, [1891] 7 *A. C.* 388 held at 388 that:

"In determining who is to have custody of and control over an illegitimate child the Court in exercising its jurisdiction with a view to the benefit of the child will primarily consider the wishes of the mother."

The dispute was between mother and a third party to whom the mother gave custody. Pertinent portions of Lord Herschell's opinion follow:

"The question principally discussed at your Lordships' Bar was whether the mother of an illegitimate child has a legal right to its custody. It was contended on behalf of the appellant that she has no such right; whilst on the other side it was argued that her rights are the same as those which a father possesses with regard to his legitimate children. In the Courts below the latter proposition appears to have been considered to be established by the authorities. I do not feel satisfied that the authorities do establish that proposition." (at *pp*. 396–397)

and

"In the case of *Reg. v. Nash* (1) [*supra*], to which I shall have occasion to refer hereafter, it was not necessary, as was there pointed out, to determine whether the mother of an illegitimate child had, according to the common law, a right to its custody, the Court exercising an equitable as well as legal jurisdiction, and being governed by the rules of equity.
\*          \*          \*          \*          \*          \*          \*          \*
\*   \*   \* As was said by Sir George Jessell M.R., in *Reg. v. Nash* (1) : 'In equity regard was always had to the mother, putative father, and relations on the mother's side.' "

Lord Herschell pointed out that formerly an illegitimate child as *nullius filius* had no one entitled to the full parental rights existing as to a legitimate child. It was summed up in the phrase "How does the mother of an illegitimate child differ from a stranger?" He then pointed out that the Poor Law Act (4 & 5 *Wm.* 4, *c.* 76, *s.* 71) changed this and that with the obligation of maintenance on the mother to age 16 went the right of its custody.

The period was transitional, for it was pointed out that common law no longer applied in the light of the equitable jurisdiction in all courts. And after discussing the facts of *Reg. v. Nash, supra,* Lord Herschell stated (at *p.* 399) :

"\*   \*   \* I think this case determines (and I concur in the decision) that the desire of the mother of an illegitimate child as to its custody is primarily to be considered."

Both the *Nash* and *Bernardo* cases dealt with the question of custody as between the mother and a third party. The language of Jessell, M.R. in the former case was *dictum* insofar as it concerned a putative father. The approval in the

latter of the *Nash* case limited itself to "the desire of the mother of an illegitimate child as to its custody is primarily to be considered," *supra*.

In any case, if *In re Petagno, supra,* where the rights of the putative father, if any, were never reached, holds that he has a right to custody of the child at any time except under the *parens patriae* doctrine, it is not now the law of this State either under statute or cases. The same would be true as to the *dicta* in *Hesselman v. Haas, 71 N. J. Eq.* 689 (*Ch.* 1906), regarding the rights to custody of a putative father. That case, too, involved custody as between the mother and a third party.

Only one of the statutes of the past century has a bearing on the problem of this case. *N. J. S. A.* 9:16–1 (*L.* 1953, *c.* 9, § 26) reads in part:

"The mother of an illegitimate child, whether married or single, shall have the exclusive right to its custody and control and the putative father of such child shall have no right of custody, control or access to such child without the mother's consent.

\*      \*      \*      \*      \*      \*      \*      \*

This section is intended to be declaratory of the existing law upon this subject and it shall, under no circumstances, be construed as an implication that the rights of such a mother have hitherto been less than as herein above defined."

As to which see *Borawick v. Barba, 7 N. J.* 393, 398 (1951).

The "existing law" upon the subject in 1953 and under the prior statute, *L.* 1913, *c.* 331, §§ 1, 2 (1924 *Supp.,* §§ 97–29(a), 97–29(b)), a supplement to *L.* 1902, *c.* 92, was apparently the law of *Friesner v. Symonds* (1890), *supra,* and *Ousset v. Euvrard* (1902), *supra.*

The last and present statute is not wholly in point because of the phrase "without the mother's consent." In the instant case the mother died when the infant was five months of age. It does, however, in an area barren of better analogy or inference, have a bearing on the subject matter of the motion.

It is doubtful that the Legislature meant here to incorporate the procedure necessary to designate a testamentary guardian (*N. J. S.* 3A:6–18 *et seq.*).

There is analogy to other statutes that bespeak a legislative policy not to change the "existing law." *R. S.* 9:2–13, part of *Title 9, Subtitle* 1, "Parental Relationship and Care, Custody, Guardianship and Support of Children in General," defines "parent":

"(f) The word 'parent,' when not otherwise described by the context, means a natural parent or parent by previous adoption, but the word parent shall not include the father of an illegitimate child."

In *R. S.* 9:3–18(f), part of the Adoption Act, the same language is again used. A consent of the father of an illegitimate child is not required in an adoption proceeding. Not even notice need be given. 19 *N. J. Practice* 415.

The motion of plaintiffs for summary judgment on the pleadings and the law is granted. Let the judgment declare the child to be a ward of the Superior Court of New Jersey, with temporary custody with the plaintiffs. The judgment should include a direction for Probation Department report, *R. R.* 4:98–8. There will be no counsel fee awarded to either party and no costs allowed.