W.W., PLAINTIFF–RESPONDENT, v. I.M., DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued December 14, 1988—Decided March 10, 1989.

Before Judges KING, ASHBEY and SKILLMAN.

*Susan M. Scarola* argued the cause for appellant (*Lomurro, Davison, Eastman & Munoz,* attorneys; *Chen Kornreich,* on the brief).

*Edward S. Donini* argued the cause for respondent (*Donini and Donini,* attorneys; *Mr. Donini,* on the brief).

The opinion of the court was delivered by

ASHBEY, J.A.D.

In this contested custody case the judge granted plaintiff, father W.W. (Walter) and defendant mother I.M. (Isobel) joint custody of C.M. (Charles), but appointed Walter the primary residential parent. Isobel's motion for a stay of this order was denied. Isobel appeals.[1]

Charles was born on August 15, 1980, at a time when Walter was married to Carla,[2] to whom he had been married for some 20 years. Isobel ran a horse farm. Her occupation was breeding horses and giving riding lessons. She also cared for her recently bedridden mother who lived with her. From birth Charles lived with his mother and grandmother and beginning in July 1982 Walter had a court order for visitation. Ultimately the parties agreed to an order for custody in which Isobel had custody and Walter had visitation. It is a fair reading of the record that Walter had consistently participated in Charles' life from birth.

---

[1]The names of the parties have been changed to protect the child's anonymity.

[2]This marriage was terminated by divorce in 1987. Walter then married Jane. Charles is the only child of either Walter or Isobel. Isobel has not married.

When Charles was two years old, he was bitten by Isobel's dog, one that Walter asserted he had previously asked Isobel to give away because he was a danger to the child. According to Walter, Isobel told him she would protect the child from the dog, but two weeks later Charles was again bitten. He was hospitalized requiring surgery.

This incident led to Walter's 1983 complaint to the Division of Youth and Family Services (DYFS). He complained about the dog attacks and also about the condition of Isobel's home. According to testimony and the DYFS records a worker for DYFS persuaded Isobel who reluctantly agreed to get rid of the dog.

On August 10, 1986, Walter requested another investigation by DYFS. The next day Joyce Jacobs, a DYFS social worker, investigated Walter's then allegation of child neglect. In her testimony Jacobs described the condition of Isobel's house. She said that clothing and old food was everywhere. There were piles of medical bottles, dirty pots and dishes, dried dog feces in several of the rooms, on the floors and under the furniture. There was a decomposing dead rat on the front step and starving kittens. There were wires hanging in the kitchen and bare electrical wires in the hallway. The house was overrun with flies and fleas. Jacobs concluded that the house was an unsafe place for Charles to live. She persuaded Isobel to allow Charles to stay with Walter while Isobel cleaned the place. Charles stayed with his father for a couple of weeks and then was returned to his mother. DYFS supervision continued until January of 1987.

Walter saw more of Charles. On February 19, 1987, while Walter was giving Charles a bath, he saw extensive bruising on the child's buttocks. Walter contacted DYFS, and Isobel admitted that she had spanked Charles on his bare buttocks because he had not gotten ready for school on time. At that time Isobel

admitted she expected Charles to get himself ready for school each day with no help from her because she was too busy.[3]

Following these incidents DYFS filed a complaint for abuse and neglect and Charles lived with Walter from February 1987 until August 1987.[4] In addition to the incidents described, the DYFS complaint asserted that Isobel had attempted to have Walter and Jane killed and only failed because she could not raise the fee. There followed a series of DYFS related court orders for evaluations and counseling including the CPC evaluation at issue, and finally an order which directed Walter to file a complaint for custody if he intended to do so. Following Walter's May 1987 custody complaint, a Family Part judge ordered that the DYFS proceeding remain inactive pending the completion of Walter's custody case and ordered the Monmouth County Probation Department to conduct a full custody investigation.

Upon the filing of the Probation Department's report, many days of trial testimony followed: November 17 and December 16, 1987, January 7, March 7, March 28, and June 10, 1988 when the judge issued his ruling. Among the witnesses testifying for Walter were his wives, his parents and other relatives, acquaintances of Isobel, DYFS workers, the principal of Charles' school and Charles' teacher. The principal testified to the "noticeable improvement" in Charles when he lived with Walter. He said that there was a "dramatic change in the boy's demeanor, his attendance, including the tardiness and his work habits, and his general ability to get along with others." Walter's former wife testified that Charles was dirty and hungry when he came to visit over the six year period that she

---

[3]According to the subsequent DYFS complaint, on February 11, 1987, Charles' school principal telephoned DYFS that Charles was often late and got angry in school. He said Charles had given another boy a kiss in school and had asked for a note to his mother to pay more attention to him.

[4]He then returned to Isobel's house under the supervision of DYFS.

saw him weekly. There was also testimony that Isobel had asked a friend to help her hire a hit-man to "do bodily harm" to Walter and Jane.

Dr. Jordan Pauker, the psychologist who had been counseling Isobel and Charles every other week since February 1987 under the DYFS order, testified that Isobel was becoming more aware of Charles's needs and was learning how to meet those needs. Dr. Pauker further testified that there was no noticeable behavioral change in Charles when he lived with his father and no reason to believe that Charles should be removed from his mother's home. Dr. Pauker gave no opinion as to Charles's best interest with respect to custody. Kathy D'Antonio, the DYFS social worker assigned to the case since July 1987, testified that since she had been involved, the housekeeping standards in Isobel's house had been acceptable.

In the middle of trial Isobel proffered the testimony of a child psychology expert who gave the opinion that it would be detrimental to Charles to remove him from her care. This proffer was prompted by the trial judge's admission of reports of the March 11, 1987 Children's Psychiatric Center (CPC) examination of Charles; the March 16, 1987 CPC testing of Isobel and the March 30, 1987 CPC testing of Walter which were court ordered in connection with the DYFS neglect and abuse complaint and which were part of the court's records. The judge also reviewed the Monmouth County Probation Department Report and the DYFS file.[5] On appeal she asserts that all of these rulings were error and that if admissible, the reports were improperly relied on by the judge.

There is controversy concerning the admissibility of hearsay in a custody trial, particularly hearsay which is not contained in

---

[5]While defendant contends on appeal that she objected to the admissibility of the Probation Department report of its investigation, and at trial she did refer to the rule concerning the admissibility of such reports, R. 5:8–4, her objection was to the admissibility of the CPC reports, to which she later conceded R. 5:8–4 did not apply.

a court ordered report. See *Ponzini v. Ponzini,* 135 *Misc.*2d 468, 515 *N.Y.S.*2d 974 (Fam.Ct.1987), detailing the law of sister states. *See also In re Scarlett,* 231 *N.W.*2d 8 (Iowa Sup.Ct. 1975); *Gumphrey v. Gumphrey,* 262 *Minn.* 515, 115 *N.W.*2d 353 (1962); *De Boynton v. De Boynton,* 137 *Cal.App.*2d 106, 289 *P.*2d 868 (1955).

■ We recognize that there was such inadmissible hearsay in this trial. John Cernak of the Monmouth County Prosecutor's office's, for instance, was permitted to testify that he was told about Isobel's purported effort to harm Walter and his wife. This was certainly inadmissible hearsay and that it was error to have admitted it.[6] Defendant's primary complaint, however, concerns the admission of the CPC reports to which the judge referred in his opinion.[7]

■ Generally, an exception to the hearsay rule is made for forensic reports in custody cases. See Annotation, "Right, in child custody proceedings, to cross-examine investigating officer whose report is used by court in its decision," 59 *A.L.R.*3d 1337, 1361 (1974), where it was said,

... In order to determine what is in the child's best interest, courts have often relaxed the seemingly inflexible procedural rules of traditional adversary proceeding. Thus it is said that the courts must try to give the parties litigant their fair trial in open court and at the same time try to do what is best for the child or children. [ (footnotes omitted) ]

We have a particular rule applicable to DYFS reports. *R.* 5:12–4(d) provides as follows:

The Division of Youth and Family Services shall be permitted to submit into evidence, pursuant to Evidence Rules 63(13) [business record exception] and

---

[6]The testimony was later confirmed by admissible evidence and the judge specifically noted that his determination would not be based on this hearsay. The error was, accordingly, harmless.

[7]Defendant also objected to the admissibility of a videotape of Cernak's interview with the child. Although the tape was admitted, we see no evidence that the judge was influenced by it. Our review of the record persuades us that its objectionable content duplicated admissible evidence. To the extent that its admission was error, that error was also, therefore, harmless.

62(5) [definition of business], reports by staff personnel or professional consultants. Conclusions drawn from the facts stated therein shall be treated as prima facie evidence, subject to rebuttal.

## *N.J.S.A.* 9:6–8.46 also states:

In any hearing [to determine child abuse or neglect] ... any writing, record or photograph, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any condition, act, transaction, occurrence or event relating to a child in an abuse or neglect proceeding of any hospital or any other public or private institution or agency shall be admissible in evidence in proof of that condition, act, transaction, occurrence or event, if the judge finds that it was made in the regular course of the business of any hospital or any other public or private institution or agency, and that it was in the regular course of such business to make it, at the time of the condition, act, transaction, occurrence or event, or within a reasonable time thereafter, shall be prima facie evidence of the facts contained in such certification.

## *N.J.S.A.* 9:6–8.10a also provides:

a. All records of child abuse reports made pursuant to section 3 of P.L.1971, c. 437 (C. 9:6–8.10), all information obtained by the Division of Youth and Family Services in investigating such reports including reports received pursuant to section 20 of P.L.1974, c. 119 (C. 9:6–8.40), and all reports of findings forwarded to the central registry pursuant to section 4 of P.L.1971, c. 437 (C. 9:6–8.11) shall be kept confidential and may be disclosed only under the circumstances expressly authorized under subsection b. herein.

b. The division may release the records and reports referred to in subsection a., or parts thereof, to:

 * * * * * * * *

(6) A court, upon its finding that access to such records may be necessary for determination of an issue before the court ...;

While defendant concedes the admissibility of testimony by DYFS workers with knowledge, defendant contends that these rules and statutes allowing for the admission of DYFS consultant reports do not apply in this case because the custody case was not a DYFS initiated proceeding and the evidence not proffered by DYFS.[8]

---

[8]Although Isobel contended the CPC reports were not admissible, it is arguable that she waived any hearsay limitation. Isobel signed a release acknowledging that any agency could release information to DYFS and providing that "when children are in substitute care through DYFS, information regarding the child's placement is shared with the Family Court and the Child Placement Review Board."

A review of the record, however, demonstrates that the cases were procedurally intertwined. DYFS began contact with mother and child in 1982. Although that case was closed, and not reopened until August of 1986, DYFS maintained supervisory contact based upon the father's 1986 complaint until January of 1987. Based upon the February 1987 complaint and ensuing order, DYFS maintained supervision while the custody trial proceeded. Isobel agreed to its continued supervision until January of 1988. It was a DYFS order of May 4, 1987, (resulting from an April 10, 1987 hearing) which directed Walter to apply for custody. The resulting custody complaint contained the notation that it was to be served upon the DYFS worker. The August 28, 1987 DYFS order reflects that the June 5, 1985 DYFS hearing was consolidated with the return date of Walter's custody complaint. Defendant's two attorneys, her DYFS-related (and court-appointed attorney) and her attorney in the custody case, appeared at that consolidated hearing. The resulting DYFS order provided that DYFS continue to pay for the mother's therapy and set the custody-visitation schedule which governed the parties' actions until the trial of the custody proceeding was complete.[9]

The record is thus replete with evidence that the disposition of the DYFS abuse and neglect complaint was dependent upon the disposition of the custody complaint. We cannot conclude that evidence clearly admissible in a DYFS proceeding, was inadmissible because DYFS had temporarily relinquished its adversarial role and that its admission was reversible error requiring a new custody hearing.

Moreover, even if their reports were not admissible as part of the DYFS file under *R.* 5:12-4(d), the CPC experts were ap-

---

[9]If there was a separate interim custody order, it is not a part of either the DYFS record or the record on appeal.

pointed by the court. *R.* 5:3–3 [10] also governs the admissibility of such reports.

> Whenever the court, in its discretion, concludes that disposition of an issue will be assisted by expert opinion, and whether or not the parties propose to offer or have offered their own experts' opinions, the court may order any person under its jurisdiction to be examined by a physician, psychiatrist, psychologist or other health or mental health professional designated by it and may appoint an accountant or other appropriate expert to appraise the value of any property or to report and recommend as to any other issue. The court may also direct who shall pay the cost of such examination or appraisal. The court may also require a social investigation by a probation officer or other person at any time during the proceeding before it.

> Significantly *R.* 5:3–3 requires no particular party to produce the expert at trial, nor the court. The comment following this rule notes that "a court-appointed expert is subject to cross-examination by the parties...." *Pressler, Current N.J. Court Rules,* Comment *R.* 5:3–3 (1987).[11]

The use of court-ordered expert reports in family matters is well accepted. The Uniform Marriage and Divorce Act (UMDA) § 404(b) provides:

> The court may seek the advice of professional personnel, whether or not employed by the court on a regular basis. The advice given shall be in writing and made available by the court to counsel upon request. Counsel may examine as a witness any professional personnel consulted by the court. [9A *U.L.A.* 156, 600 (1987) ].

UMDA § 405 also provides for a court ordered investigation which may include diagnosis by professional personnel. A report is to be made available, including texts of diagnostic reports and the names and addresses of persons consulted and any party to the proceeding may call the investigator and any person whom he has consulted for cross-examination. The principle behind the admissibility of such expert reports, partic-

---

[10]Effective January 2, 1989, the relevant part of *R.* 5:3–3 was redesignated as *R.* 5:3–3(a). That part of the rule respecting economic experts is now in *R.* 5:3–3(b).

[11]*See also Fed.R.Evid.* 706(a) which provides,

> ... A witness so appointed [by the court] shall advise the parties of his findings, if any; his deposition may be taken by any party; and he may be called to testify by the court or any party. He shall be subject to cross-examination by each party, including a party calling him as a witness.

ularly those kept by the State agency entrusted with the duty of child care has long governed our law. In the case of *In re Cope*, 106 *N.J.Super.* 336, 343 (App.Div.1969), we said that it was impossible to expect DYFS (then the Bureau of Children's Services) workers "to give live testimony on all matters within their personal knowledge." We ruled that it then became "necessary to allow certain evidence to be produced in a hearsay form while seeking to give full protection to the rights of the parent." We further said:

> Reports of this type, prepared by the qualified personnel of a state agency charged with the responsibility for overseeing the welfare of the children in the State, supply a reasonably high degree of reliability as to the accuracy of the facts contained therein. *The parent remains free* to offer evidence contradicting any statements present in such reports and, of course, the trier of the facts may in his discretion call for live testimony on any point. [*Id.* at 344] [Emphasis added.]

With regard to the probation report, *R.* 5:8–4 requires:

> The written report of an investigation made pursuant to this rule shall be filed with the court, shall be furnished to the parties, and shall thereafter be filed in the office of the Chief Probation Officer. The report shall be regarded as confidential, except as otherwise provided by rule or by court order. The report shall be received as direct evidence of the facts contained therein which are within the personal knowledge of the probation officer who made the investigation and report, subject to cross-examination of him.

Defendant claims that the Probation Department investigator's report also included inadmissible hearsay which was not within her personal knowledge. No such objection was made at trial.[12] Moreover, the officer's requirement for "personal knowledge" has been interpreted by this court to be related to a requirement that the hearsay result from the officer's personal investigation. *See Salmon v. Salmon*, 88 *N.J.Super.* 291, 308 (App.Div.1965).

The essence of the rationale behind hearsay inadmissibility is the absence of an opportunity for cross-examination. 5 *Wigmore, Evidence* (Chadbourn rev. 1974), § 1362 at 3. It is

---

[12]A majority of the witnesses interviewed by the investigator actually testified.

generally accepted that "the unhappy recipient of an adverse investigation ... may be unable to have the whole report thrown out on the basis of inadmissible hearsay ... [but has] the option of calling into court a quoted witness to contradict the report or to explain comments allegedly made to the investigator." Viken, "Hearsay and the Child: What Role Does a Youngster's Word Have in a Custody Battle?", 10 *Fam.Advoc.* 41, 41 (1987). *Cf.* Dranoff and Cohen, "Psychiatrists, Psychologists, and Social Workers: Getting the Most Out of Experts," 10 *Fam.Advoc.* 20, 23 (1987).[13]

Defendant fails to specify the benefit that cross-examination would have provided concerning any of these witnesses. During the custody trial defendant was represented by counsel who subpoenaed a DYFS worker on November 16, 1987. Counsel was given the opportunity to question that worker on December 16, 1987, and elected to proffer the worker as defendant's witness on March 7, 1988. Our review of the court record which was not proffered by the parties but which is contained in the DYFS file shows that the CPC reports were available to defendant's court-appointed counsel for the April 10, 1987 DYFS hearing.[14] Her attorney in this proceeding must have been aware of these reports in connection with the June 5, 1987 consolidated custody and DYFS hearing at which she appeared. At no time during the custody trial did counsel specify an inability to subpoena these forensic experts or request their production.[15] Nothing in the record suggests that any challenged author of the CPC reports was unavailable to testify when two DYFS workers did testify.

---

[13]*Family Advocate* is a publication of the American Bar Association entitled, "A Practical Journal of the Family Law Section."

[14]The original record on appeal failed to contain the DYFS record, including the CPC reports. We requested it and have reviewed its contents, as well as the photographs in evidence.

[15]One of the CPC offices is within walking distance from the court house.

Defendant concedes that on December 16, 1987, she was specifically offered the right to examine the CPC experts if she chose when she was advised that the court considered the DYFS consultant's reports admissible. At that time the court also agreed to review the entire DYFS record with defense counsel so that a decision concerning whether to call the current DYFS worker, Kathy D'Antonio, as a witness could be properly informed. The trial did not end until June 1988 so there was ample opportunity to call these witnesses. Yet, following review of all of the challenged material, defendant's counsel elected not to call the authors of the CPC reports, but instead proffered defendant's expert witness, Dr. Lewis. We reject defendant's assertion that it was the obligation of plaintiff, or of the court, to produce the authors for cross-examination without being requested. *R.* 5:3–3; *R.* 5:8–4. Whether these reports were improperly relied on as the sole basis for the custody adjudication is another issue which we will consider separately.

Defendant also claims that the admission of the DYFS psychological evaluation reports and the Monmouth County Probation Report was in violation of the "best evidence rule." The "best evidence rule," *Evid.R.* 70, provides that "[a]s tending to prove the content of a writing, no evidence other than the original writing itself is admissible...." The reports in question were part of the DYFS file which was admitted into evidence. When Walter moved the DYFS psychological reports into evidence the judge acknowledged that they were copies. The DYFS social worker identified the original file which was admitted into evidence. There is no basis for a "best evidence rule" argument.

■■ Defendant also claims the trial judge erred in admitting the testimony of Joyce Jacobs and William Ulrich. Joyce Jacobs conducted the investigation of Isobel's home for DYFS. She testified to conditions she personally observed. William Ulrich, a DYFS employee who was admittedly a long time

friend of plaintiff, testified to conditions he observed, including the presence of a loaded shotgun in the middle of the living room floor and to Charles' physical condition on the day Isobel spanked him.[16]

*Evid.R.* 7 states that except as otherwise provided in the rules of evidence or other law of New Jersey, "every person is qualified to be a witness ... no person is disqualified to testify to any matter ... [and] all relevant evidence is admissible." While defendant asserted that these witnesses were testifying from stale observation, and, in the case of Ulrich, from biased observation, such assertions affect the weight, not the admissibility of their testimony, subject to *Evid.R.* 4.[17]

Defendant next challenges the admission of photographs of Isobel's home taken by Walter, asserting that in taking the photographs, Walter violated her Fourth Amendment guarantee against illegal searches and seizures because Walter was a police officer. This argument is meritless. Taking photographs for use in a personal custody dispute is not State action. Clearly Walter did not take the photographs in his capacity as a police officer but rather as a father. *See State v. Sanders*, 185 *N.J.Super.* 258 (App.Div.1982).

Isobel's other contentions with regard to preferential treatment given Walter as a *pro se* litigant are also without merit. At the trial, in response to some of these objections, the judge explained:

> I take in everything that's appropriate, that I think [is] appropriate, to decide a custody case.... [H]e's not getting any benefit by being a pro se. I think I've yelled at him more times than I've yelled at anyone else.

\* \* \* \* \* \* \* \*

---

[16]The record is replete with evidence of Charles' exposure to firearms including an early incident when he swallowed bullets.

[17]Defendant's objection to Jacobs' testimony was based upon her assertion that Jacobs' name did not appear in the DYFS record.

These evidence rulings are my standard evidence rulings when it comes to a custody case.... Everything's in the record and I'm not going to get reversed because I excluded documents. That's not because one of the litigants is pro se.

Defendant asserts that Walter presented DYFS worker D'Antonio as his witness but that when she took the stand Walter stated that he had no questions to ask. She asserts Walter then proceeded to state the probation report recommendation "out of the blue." Our review persuades us D'Antonio was called to testify by the judge in order to identify the DYFS records. Walter rested his case based on the probation department recommendation that he receive custody.[18]

Isobel also asserts that when Walter was a witness, the judge acted as his counsel. We do not find this assertion accurate. The judge properly ruled on the questions requiring an answer. *Evid.R.* 4. The questions were either hypothetical or highlighted facts otherwise in evidence, particularly that Walter was married to his first wife when he fathered Charles with Isobel and also when he fathered a child (which miscarried) with his present wife.

■ Defendant next asserts that the trial judge erred by not considering Charles's preference to live with his mother when he concluded that Charles was bonded to his mother but that he was also bonded to his father. Although Charles had "expressed a desire" to the judge to live with his mother, the judge did not foresee that Charles would have a problem living with his father, based upon "the past experience of the prior transfer of custody which developed into a very progressive and affirmative situation for [Charles's] betterment."[19] Charles

[18]Defendant does not explain why D'Antonio was subpoenaed by her to appear on November 17 (DYFS file). She was not then questioned and cross-examined. Defendant later examined D'Antonio.

[19]We have no explanation of why no record was made of this interview. See *R.* 5:3–2 providing for a verbatim record of *in camera* proceedings and *Lavene*

was seven years old at the time of the trial. Our review of the record indicates that the child had made conflicting statements concerning his preference. In 1987 he appears to have expressed a preference to live with his father. Defendant's child psychology expert acknowledged that he had been ambivalent in his preferences.

A trial judge is not bound by a young child's preference to live with one parent over the other. The judge is only required to give "due weight to the child's preference." The preference is a factor which the judge should consider along with all of the other relevant factors. *Lavene v. Lavene*, 148 *N.J.Super.* at 271–272. In *Lavene*, the court acknowledged that a child of eight and one-half years "clearly lack[s] the maturity and judgment to make a dispositive statement of custodial preference...." *Id.* at 271.

Finally defendant asserts that the trial judge's decision was against the weight of the evidence. The trial court's factual findings based upon matters of credibility should not be disturbed unless they result in a denial of justice. *Rova Farms Resort v. Investors Ins. Co.*, 65 *N.J.* 474, 483–484 (1974). While the court's findings were detailed pursuant to *R.* 1:7-4, defendant asserts that the factual findings were uncorrelated to the relevant legal conclusions. *Curtis v. Finneran*, 83 *N.J.* 563, 570 (1980). Thus, defendant claims that the extent to which the decision rested upon stale and insubstantial evidence as well as hearsay is not clear.

We agree that much of the evidence was hearsay, although admissible. Much of the evidence was stale. Plaintiff relied upon Isobel's 1982 initial refusal to give up her dog, her 1986 failure to take parental part in getting Charles ready for school, the 1986 unlivable and dangerous condition of her home, her 1987 physical abuse. There were expert reports without expert

---

*v. Lavene*, 148 *N.J.Super.* 267, 272 n. 1 (App.Div.1977), certif. den. 75 *N.J.* 28 (1977).

testimony; testimony from experts who did not evaluate all concerned, and expert opinions based upon limited contact. The judge did not differentiate respecting the evidence upon which he relied.

The leading case on custody is *Matter of Baby M.*, 109 *N.J.* 396 (1988), there the Court said,

"[u]nder the Parentage Act the claims of the natural father and the natural mother are entitled to equal weight, *i.e.*, one is not preferred over the other solely because he or she is the father or the mother. *N.J.S.A.* 9:17–40. The applicable rule given these circumstances is clear: the child's best interests determine custody.

> \* \* \* \* \* \* \* \*

... The question of custody in this case, as in practically all cases, assumes the fitness of both parents, and no serious contention is made in this case that either is unfit. The issue here is which life would be *better* for [the child]. ... [*Matter of Baby M*, 109 *N.J.* at 453–454 (footnote omitted) (emphasis in the original)].

What is important is the parental track record. *Id.* at 456. UMDA, § 402 defines the relevant factors respecting custody best interest as follows:

(1) the wishes of the child's parent or parents as to his custody;

(2) the wishes of the child as to his custodian; [20]

(3) the interaction and interrelationship of the child with his parent or parents, his siblings, and any other person who may significantly affect the child's best interest;

(4) the child's adjustment to his home, school, and community; and

(5) the mental and physical health of all individuals involved.

The court shall not consider conduct of a proposed custodian that does not affect his relationship to the child. [9A *U.L.A.* at 561].

Defendant relies on the fact that the only two experts who testified urged that she remain the primary custodial parent. We do not find that assertion entirely accurate. Dr. Pauker and Kathy D'Antonio both gave an opinion that defendant was not a danger to her child and that there was no reason for the State to intervene between defendant and her child. Neither

---

[20]Cases construing a requirement that the court consider the wishes of the child emphasize the age of the child as relevant. See UMDA § 402, 9A *U.L.A.* at 568–569.

expressed a preference between parents equally entitled to custody. While the CPC evaluations recommended that plaintiff retain emergency custody, no one contended that the CPC evaluation of either parent should govern after defendant demonstrated "a greater emotional capacity to successfully meet her son's needs." Defendant's forensic expert did give an opinion that defendant should be the primary custodial parent. His opinion was based upon a very limited contact with the parties, which the Family Part Judge was free to consider in evaluating its worth.[21]

Disregarding the challenged evidence in support of the judge's determination, there was undisputed evidence that the child's behavior as demonstrated by his school performance, particularly his social adjustment, had been improved while the child lived with his father. The judge also found that placing the child's primary residence with plaintiff would ensure safety, structure and a stable home life, "conducive to appropriate peer relationships" giving him "opportunity to socialize with very significant persons in his life." We find this factual conclusion supported in the record of credible evidence.[22]

The court's June 22, 1988 oral opinion provided that the child was to be in Isobel's custody during the month of July of 1988, to be transferred in August to Walter. He was then to be with her three out of four weekends from Friday at 6 to Sunday at 6. Walter was to have him the fourth weekend, but during that week the child was to be with Isobel on Wednesday evening from 6 to 9. On July 22, 1988, during the argument on Isobel's motion for a stay of the order, it was asserted that on July 18, 1988, Dr. Pauker had recommended that defendant

[21]On the last day of trial, March 28, 1988, defendant's counsel did not seek updated psychological evaluations of the parties but merely asked the court to interview the child.

[22]In her testimony Isobel admitted many of the assertions Walter made and which recurred in the DYFS reports respecting Charles' contact with his peers, his inappropriate living arrangements, and her inappropriate conduct.

have continued custody, and that a Dr. Katz had also made such a recommendation.[23] During that interchange it was asserted that the final order had restricted defendant's August visitation to ½ a day. Walter also asserted that Isobel had filed a retaliatory complaint that Jane was sexually and physically abusing the child. Isobel's counsel asserted that DYFS had asked the child about sexual abuse.

■ The judge denied the stay and refused the proffer, saying,

[t]his case has been going on since the summer of 1986 when the Division of Youth and Family Services became involved in the case. The disputed custody issues arose in May of 1987. An investigation by the Probation Department followed and a full contested trial with many witnesses and voluminous testimony and opinions was presented to the Court on 12/16/87, 3/7/88, 3/28/88 and June 10th, 1988.

It is understandable that the judge, anxious for finality, and concerned that child have a stable school life in September 1988, rejected these late submissions. Nonetheless despite the extensive record, these late proffers raise questions about the long term appropriateness of the order.

Several factors in this case exacerbated the difficult problems normally attendant upon litigated custody. We begin with the fact that plaintiff, a *pro se* policeman, was familiar with the prior DYFS proceedings over previous years, having instigated them. Rightly or wrongly, he assumed that the records of those proceedings along with the Probation Department report would dispose of the issue. Accordingly, he subpoenaed only fact witnesses and rested on the record. Defendant's counsel, on the other hand, had not been involved in these earlier DYFS matters. Moreover, defendant was obliged to change counsel for medical reasons. Although the record is clear that defendant's counsel was aware of the DYFS record at least as early as June of 1987, defendant's present counsel appeared to be

---

[23]Apparently Dr. Katz's report (not in the record) recommended custody in defendant with treatment and DYFS supervision.

surprised by much of plaintiff's evidence. It is inferable that defendant's counsel realized the need for expert testimony late in the protracted litigation. Defendant's belated proffer of this expert, virtually without notice, created an atmosphere of discovery rule violation. Moreover, that expert had so little time with mother and child that a credibility gap in his opinion was evident.

In some measure the judge appears to have relied upon the CPC reports. The judge relied upon the fact that the therapist took no position between parents. The judge relied on school records, apparently as current as the winter term of 1988, but plaintiff's later proffer of the entire 1987–1988 record was rejected.

We are now in the middle of the 1988–1989 winter term. Charles has been in a new school for the first semester under Walter's custody. The judge relied upon Walter's family stability and Charles' increased access to Carla, Walter's former wife. Most important he considered it likely that Walter's family would increase Charles' ability to experience normal activity with other children in a home and neighborhood setting, something the record makes clear he had never known, and something which may have been related to his peer difficulties at school. As we have noted those findings were justified by the evidence. On the other hand, the evidence proffered by Walter also suggested that his demands for Charles' perfection, combined with Charles' loss of his mother and grandmother could possibly be detrimental to Charles' overall emotional growth.[24]

The record makes clear that whatever the judge's school-related reasons for the custody change, no thought was devoted in July 1988 to the out-of-school advantages to Charles from

[24]The record is replete with evidence that up until August of 1986, Charles' evening meals and his housekeeping environment had been the province of his grandmother, whose illness, culminating in her 1988 death during trial, was devasting to him, and accounted for much of Isobel's difficulties.

day to day living at his mother's farm, given that the health risks had been alleviated and that Charles' mother was trying to work with the therapist to improve her parenting skills.[25] While we are satisfied, therefore, that the judge's findings concerning Charles' living arrangements for the school year 1988–1989 were supported in the record, the evidence did not warrant the finality which the order was given. We are obliged therefore to remand the matter for a new hearing at the end of the 1988–1989 school year. Prior to such a hearing, all parties are to be evaluated by one therapist, who must be available to give testimony. The Probation Department is to make an updated investigation and the investigator made available to testify. Charles' 1988–1989 school records are to be made available to the court subject to such necessary production of witnesses as the court in its discretion directs. At this hearing the parties may challenge the prior CPC reports if the court continues to regard them as relevant. Otherwise the parties are not to duplicate evidence previously presented and the court should limit the testimony in the best interest of the child.[26] This will be best accomplished by a pre-trial conference to narrow factual disputes.

The order for custody is affirmed for the 1988–1989 school year. The residential custody terms respecting each parent following July 15, 1989, are to be ordered as a result of a new hearing based upon current information. Such a hearing must be completed by July 15, 1989.

SKILLMAN, J.A.D., dissenting.

I am unable to agree with the part of the majority's opinion which concludes that "an exception to the hearsay rule is made

---

[25] In 1987, when Charles lived with Walter, but spent afternoons at Isobel's, the record indicated that his peer interaction did not suffer.

[26] We leave to the judge's discretion the extent of his interview with the child. From that interview, however, a record must be made.

for forensic reports in custody cases" (at 502). Furthermore, I am convinced that psychological reports which the trial court erroneously admitted into evidence played a significant role in its decision awarding custody of Charles to Walter.[1] Therefore, I dissent from the majority's affirmance of the trial court's custody order insofar as it relates to the 1988–1989 school year.[2]

Charles was born out of wedlock on August 15, 1980 and remained in the sole custody of Isobel until he was six years old. In August 1986, Walter lodged a complaint of child neglect against Isobel with the Division of Youth and Family Services (DYFS). The agency's investigation disclosed that Isobel's home was in a dirty and disheveled condition. Consequently, DYFS persuaded Isobel to allow Charles to stay with his father while she cleaned her house. Charles stayed with his father for a few weeks before being returned to Isobel. In February 1987, Walter complained to DYFS that Isobel had abused Charles by a spanking which resulted in extensive bruising of the child's buttocks. DYFS subsequently filed a complaint against Isobel for abuse and neglect, which resulted in Charles being placed in Walter's custody. Charles remained with his father from February 1987 until August 1987, when he was returned to Isobel's custody under DYFS supervision. According to Kathleen D'Antonio, the DYFS caseworker assigned to the case at the time of trial, DYFS found Isobel's care

---

[1] I have used the same fictitious names as the majority to refer to the parties and their child.

[2] Isobel also argues that the report of the Monmouth County Probation Department was inadmissible hearsay. However, Isobel waived whatever objection she might have had to the admission of this report by not raising the objection before the trial court. *In re Petagno*, 24 *N.J.Misc.* 279, 48 *A.2d* 909, 913 (Chan.1946). Therefore, Isobel's arguments relating to the admissibility of the probation report are not discussed in this opinion. I would reject Isobel's other arguments substantially for the reasons expressed in the majority opinion.

of Charles subsequent to August 1987 to be satisfactory and planned to close its file in August 1988.

Thus, as of the date of the trial court's decision, Charles, then nearly eight years old, had been in the custody of Isobel for all but six months of his life. Furthermore, the agency responsible for his removal from Isobel for those six months had concluded that there was no need to continue supervising Isobel's custody of Charles. Nevertheless, the trial court concluded, based substantially on written reports of experts prepared fifteen months earlier, that custody should be transferred to Walter. In my view, this decision rests on a foundation of inadmissible hearsay and should be reversed outright rather than simply denied permanent effect.

Isobel presented the testimony of two experts to support her claim that she should retain custody of Charles. The first of these experts, Dr. Jordan Pauker, a licensed psychologist, became involved with the parties by a referral from DYFS at the time Charles was removed from Isobel's home and placed in Walter's custody. Dr. Pauker concluded that there was "no evidence or reason to feel that [Charles] should be removed from his mother's home." However, Dr. Pauker declined to express an opinion as to whether it would be more beneficial for Charles to reside with his mother than with his father. The second expert presented by Isobel, Dr. Michael Lewis, a professor of pediatrics and psychiatry at the Robert Woods Johnson Medical School and Chief of the Institute for the Study of Child Development, interviewed Isobel and Charles and reviewed the psychological reports prepared in connection with the case. Dr. Lewis stated that he would "rate [Isobel] on a very high category of good parenting" based upon the "time and energy that she spends ... attending to the child's interest and needs, being concerned about the child's development, psychologically as well as mentally." Dr. Lewis also expressed the opinion that Charles' "primary attachment and bonding" was to Isobel and his grandmother, now deceased. Therefore, Dr. Lewis concluded that the removal of Charles from Isobel's custody would be

"disruptive" and "potentially quite harmful for [his] development."

Walter did not present any expert testimony to dispute the conclusions reached by Drs. Pauker and Lewis. In addition to lay testimony, mostly provided by Walter's friends and relatives, regarding the conditions in Isobel's home, her lifestyle, and her treatment of Charles, Walter relied exclusively upon written reports of the Children's Psychiatric Center (CPC) and the probation department to support his claim for custody of Charles. The CPC report states that Isobel has "a moderate level of pathology in her overall personality structure"; that her "markedly deflated sense of self-worth and her expectancy of failure and humiliation constrain all efforts on her part to function without support"; and that "she often acts in a petulant and passively aggressive manner, occasionally attacking others capriciously for their lack of support." The report also states:

> While test data does not strongly indicate that the potential for recurrent abuse is likely, there are clinical elevations which point out [Isobel's] depressive affect, rigidity in child-rearing, anger and bitterness towards [Charles'] father, and a struggle to constrain feelings of hostility and resentment. These factors coupled with [Isobel's] inability to recognize when she has administered too harsh of punishment to her son does not rule out potential abuse.

On the other hand, the CPC's evaluation of Walter states that "[b]ased on the conclusions generated from test material there are no indications that [Walter] suffers with underlying personality disturbance or would potentially provide maltreatment towards [Charles]." The CPC also reported that Charles stated "he didn't want to go back to live with his mother" and that "[i]n contrast, [Charles] states he likes living with his dad and [his wife], and being very happy at this home."[3] Based on these evaluations, the CPC report recommended that Charles "remain in his father's custody, at least temporarily, until

---

[3]Significantly, every other expert who interviewed Charles reported that he expressed a preference to remain in his mother's custody. Charles also expressed this preference in an interview with the trial judge.

[Isobel] demonstrates a greater emotional capacity to successfully meet her son's needs."

In overruling Isobel's objection to the admission of the CPC reports, the court stated:

> I'm going to see every document and consider every document. It's going to come in one way or the other. If I'm going to err, I'm going to err in letting things in and not excluding them.
>
> If I have to decide custody of a child, everything is coming in.

Moreover, the trial court placed significant reliance upon the CPC reports in awarding residential custody of Charles to Walter. In discussing Walter's fitness to serve as custodial parent, the court stated:

> Starting with the CPC psychiatric evaluations, plaintiff is found essentially to be a well functioning individual with no major personality disturbances. There are simply no underlying personality disorders disclosed by the various tests that have been administered.

And in concluding that Isobel was less capable than Walter to serve as custodial parent, the court stated:

> On the negative side, respecting the defendant's position, starting with the CPC psychological or psychiatric report, she is described as being at times in emotional turmoil, periods of despondency leading to occasional irrational thinking, [and] periods of bizarre behavior.

The psychological evaluations of the parties and the recommendations as to custody of their son contained in the CPC reports constituted hearsay; that is, statements "offered to prove the truth of the matter stated ... made other than by a witness while testifying at the hearing." *Evid.R.* 63. Therefore, the reports were inadmissible unless shown to fall within an exception to the rule against hearsay. *Ibid.*

Our courts have recognized that reports containing the observations and opinions of experts may be admitted into evidence under some circumstances pursuant to the business records exception to the rule against hearsay, *Evid.R.* 63(13). *See, e.g.,* *State v. Martorelli*, 136 *N.J.Super.* 449, 453–456 (App.Div.1975) (blood test report); *State v. McGeary*, 129 *N.J.Super.* 219, 224–227 (App.Div.1974) (certification of operability of breathalyzer); *Webber v. McCormick*, 63 *N.J.Super.* 409, 416 (App.Div. 1960) (X-ray report). However, "not all diagnostic findings are

admissible" as business records. *State v. Martorelli, supra,* 136 *N.J.Super.* at 454; *cf. Clowes v. Terminix International, Inc.,* 109 *N.J.* 575, 599 (1988) (diagnosis of alcoholism in hospital record constituted hearsay which was incompetent to support such a diagnosis). The essential test of admissibility is "the degree of complexity of the procedures utilized in formulating the conclusions expressed in the ... report." *State v. Matulewicz,* 101 *N.J.* 27, 30 (1985). In determining the degree of complexity of an evaluation in an expert's report, a court should consider among other things "the relative degrees of objectivity and subjectivity involved in the procedure" and "the routine quality of each analysis." *Ibid.*

The psychological evaluations contained in the CPC reports are not in any sense routine or objective but rather involve difficult and sensitive subjective judgments. The evaluations are based in large part on interviews with the parties and Charles and the examiners' evaluations of their responses. Moreover, even the psychological tests administered to the parties involve a substantial degree of subjectivity in the interpretation of results. Therefore, the "degree of complexity" of these psychological evaluations precludes the admissibility of the CPC reports as business records. Rather, if Walter wished to have the opinions of the experts who prepared these reports considered, he should have been required to present their testimony. This would have afforded Isobel the opportunity to cross-examine these experts regarding the conditions under which their interviews were conducted, the factual bases for their opinions and the evaluative process which led them to conclude that Walter should be awarded custody of Charles. In addition, since the CPC reports do not indicate the educational backgrounds or experience of the persons who prepared them, live testimony by these persons would have provided an opportunity to determine their professional qualifications and compare them with the qualifications of the experts called by Isobel.

As I read the majority's opinion, it implicitly acknowledges that psychological reports containing the kind of observations and opinions found in the CPC reports ordinarily would not be admissible under the New Jersey Rules of Evidence. However, the majority concludes that because this is a child custody case which is indirectly related to a child abuse proceeding previously initiated by the DYFS, the rules of evidence are modified by court rules and statutory provisions governing child abuse proceedings.

I do not read any of the authorities cited by the majority to modify the rules of evidence governing the admissibility of hearsay in connection with child custody cases. First, I am unable to reconcile the majority's expansive interpretation of *R.* 5:12–4(d) and *R.* 5:3–3 with the Supreme Court's firmly stated reluctance to modify the rules of evidence without legislative and gubernatorial participation pursuant to the procedures set forth in the Evidence Act of 1960. *See State v. D.R.* 109 *N.J.* 348, 371–377 (1988); *Busik v. Levine,* 63 *N.J.* 351, 367–368 (1973), appeal dism. *sub. nom. Levine v. Busik,* 414 *U.S.* 1106, 94 *S.Ct.* 831, 38 *L.Ed.*2d 733 (1973); *cf. Ramos v. Community Coach,* 229 *N.J.Super.* 452, 457 (App.Div.1989) ("It is unlikely that the Supreme Court has the authority to render inadmissible under its rule-making power evidence that would be admissible under the Rules of Evidence."). Evidence Rule 63 prohibits the admission into evidence of hearsay, subject to the exceptions set forth in Rules 63(1) through 63(32). The rules of evidence do not authorize the adoption by court rule of further exceptions to the rule against hearsay. Therefore, rules of court dealing with the admissibility of evidence should be construed, if at all possible, in a manner consistent with the rules of evidence.

Rule 5:12–4(d) provides in pertinent part that:

> The Division of Youth and Family Services shall be permitted to submit into evidence, *pursuant to Evidence Rules 63(13) and 62(5),* reports by staff personnel or professional consultants. [Emphasis added].

The CPC reports were submitted to the court by a party to a private custody dispute, not by DYFS. Therefore, *R.* 5:12–4(d) is inapplicable. Moreover, even if the CPC reports had been offered by DYFS, *R.* 5:12–4(d) would not authorize their admission. Reports of professional consultants may be admitted under this rule only "pursuant to Evidence Rules 63(13) and 62(5)." Since the CPC reports are not admissible as business records pursuant to *Evid.R.* 63(13), they also are inadmissible under *R.* 5:12–4(d).

The majority also relies upon *R.* 5:3–3, which provided as follows at the time of trial:[4]

> Whenever the court, in its discretion, concludes that disposition of an issue will be assisted by expert opinion, and whether or not the parties propose to offer or have offered their own experts' opinions, the court may order any person under its jurisdiction to be examined by a physician, psychiatrist, psychologist or other health or mental health professional designated by it and may appoint an accountant or other appropriate expert to appraise the value of any property *or to report and recommend as to any other issue....* The court may also require a social investigation by a probation officer or other person at any time during the proceeding before it. [Emphasis added].

The majority apparently reads the part of this rule providing for the submission of reports by court appointed psychologists or other mental health professionals as authorization for the admission of such reports into evidence at trial. However, the CPC reports were prepared at the request of DYFS and thus do not constitute reports by court appointed experts.

Moreover, *R.* 5:3–3 does not deal with the admissibility of evidence. It only authorizes the submission of reports to the court. Such reports are submitted before trial and often play a part in settlement negotiations and other pretrial dispute resolution procedures. Furthermore, an authorization for the submission of expert reports is not inconsistent with a requirement that experts be called to testify at trial if a party wishes to rely upon their opinions. *See Wayne Tp. v. Kosoff,* 73 *N.J.* 8, 15

---

[4]As noted by the majority (at 505, n. 10), this rule was subsequently amended.

(1977). Indeed, any expert who a party expects to call as a witness may be required to submit a report stating "the subject matter on which the expert is expected to testify, ... the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion." *R.* 4:10–2(d)(1). Therefore, there is no reason to read *R.* 5:3–3 as authorization for the admission into evidence of reports prepared by court appointed experts in family actions without the opportunity for cross-examination.

In addition, the majority relies upon *N.J.S.A.* 9:6–8.10a(b)(6). This statute authorizes DYFS to release records and reports to a court "upon its finding that access to such records may be necessary for determination of an issue before the court." But like *R.* 5:3–3, *N.J.S.A.* 9:6–8.10a(b)(6) does not deal with the admissibility of evidence at a trial. Rather, it provides an exception to the general rule established by *N.J.S.A.* 9:6–8.10a of confidentiality of DYFS records and reports. Therefore, *N.J.S.A.* 9:6–8.10a(b)(6) provides no support for the majority's conclusion that the trial court properly admitted the CPC reports into evidence.

Finally, the majority relies upon *N.J.S.A.* 9:6–8.46a(3) which states in pertinent part:

> *In any hearing under this act* ... any writing ... made as a memorandum or record of any condition, act, transaction, occurrence or event relating to a child in an abuse or neglect proceeding of any hospital or any other public or private institution or agency shall be admissible in evidence in proof of that condition, act, transaction, occurrence or event if the judge finds that it was made in the regular course of the business of any hospital or any other public or private institution or agency, and that it was in the regular course of such business to make it, at the time of the condition, act, transaction, occurrence or event, or within a reasonable time thereafter, ... [Emphasis added].

This statutory provision is inapplicable because this private custody action was not brought under *N.J.S.A.* 9:6–8.8 *et seq.*, which only governs child abuse and neglect actions brought by DYFS.

Furthermore, even if *N.J.S.A.* 9:6–8.46a(3) were applicable, the CPC reports would still be inadmissible. The thrust of

*N.J.S.A.* 9:6–8.46a(3) and *Evid.R.* 63(13) are substantially the same. Both the statute and the evidence rule provide for the admission into evidence of business entries made in the ordinary course of business. *N.J.S.A.* 9:6–8.46a(3) does not expressly condition the admissibility of a business entry upon the showing required by *Evid.R.* 63(13) that "the sources of information from which [the business entry] was made and the method and circumstances of its preparation were such as to justify its admission." However, *N.J.S.A.* 9:6–8.46a(3) conditions admissibility upon a showing that the business entry was "made in the regular course of the business" and that "it was in the regular course of such business" to make the "memorandum or record" sought to be admitted. I read this language to condition admissibility upon a showing that a business entry is the kind regularly and routinely made by a hospital or other institution. Such routineness provides the same assurance of reliability as required for admissibility under the final clause of *Evid.R.* 63(13). *See In re Guardianship of Cope,* 106 *N.J.Super.* 336, 343 (App.Div.1969); *see also R.K. v. Dept. of Human Services,* 215 *N.J.Super.* 342, 348 (App.Div.1987). However, the subjective evaluations of the parties and the appropriate custodial arrangement for Charles contained in the CPC reports do not have such routineness as to warrant their admissibility under *N.J.S.A.* 9:6–8.46a(3).

As we have observed on a prior occasion, "[t]here are obviously few judicial tasks which involve the application of greater sensitivity, delicacy and discretion than the adjudication of child custody disputes, which result in greater impact on the lives of those affected by the adjudication, and which require a higher degree of attention to the properly considered views of professionals in other disciplines." *Fehnel v. Fehnel,* 186 *N.J.Super.* 209, 215 (App.Div.1982). Therefore, "the parties must be afforded every reasonable opportunity to introduce expert witnesses whose evaluation of the family situation may assist the judge in determining what is best for the children." *Ibid.*

However, the desirability of obtaining expert opinions in child custody cases does not mean that a party should be permitted to introduce such opinions by written reports, thereby depriving the other party of the opportunity for cross-examination and also depriving the court of the opportunity to evaluate the expert's credibility. To the contrary, the importance and sensitivity of child custody decisions, the significance of expert opinions in reaching such decisions and the inevitable elements of subjectivity in experts' recommendations as to custody, all underscore the need for strict adherence to the rules of evidence adopted to assure the fairness and reliability of the fact finding process at trial.[5]

Accordingly, I dissent from the part of the majority's opinion which affirms the trial court's order of custody insofar as it relates to the 1988–1989 school year. However, I concur in the part of the majority's opinion which remands the matter for a new hearing with respect to the residential custody of Charles after July 15, 1989. Moreover, in view of the potential negative effect upon Charles of any change in his schedule during the middle of a school year, I concur in the majority's decision that the existing custody arrangements should be continued until the hearing on remand is completed.

---

[5]Since the admissibility of the CPC reports must be determined under the New Jersey Rules of Evidence adopted pursuant to the procedures set forth in the Evidence Act of 1960, this appeal can be decided without consideration of decisions in other jurisdictions interpreting different evidence rules. However, I note that courts in other jurisdictions have generally refused to admit expert reports, including reports of court appointed experts, in child custody actions, unless the experts preparing the reports are called to testify. *See, e.g., Denningham v. Denningham,* 49 *Md.App.* 328, 431 *A.*2d 755 (1981); *In re Swan,* 173 *Mont.* 311, 567 *P.*2d 898 (1977); *Ponzini v. Ponzini,* 135 *Misc.*2d 468, 515 *N.Y.S.*2d 974 (Fam.Ct.1987); *Fuhrman v. Fuhrman,* 254 *N.W.*2d 97 (N.D.1977); *Malone v. Malone,* 591 *P.*2d 296 (Okla.1979); *Coble v. Coble,* 323 *Pa.Super.* 445, 470 *A.*2d 1002 (1984). *Contra Sabol v. Sabol,* 624 *P.*2d 1378, 1381–1383 (Ha.Ct.App.1981). *See,* generally, Annotation, *Right, In Child Custody Proceedings, To Cross-Examine Investigating Officer Whose Report Is Used by Court In Its Decision,* 59 *A.L.R.*3d 1337 (1974).