**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0566-19

GREGORY SHAPIRO and
EVERGREEN REALTY
MANAGEMENT, LLC,

     Plaintiffs-Respondents/
     Cross-Appellants,

v.

VLADIMIR BOUKHOVER,

     Defendant-Appellant/
     Cross-Respondent,

and

JAY I. LAZEROWITZ, LEO
BURD, and EUGENY
KLYACHMAN,

     Defendants.

_____

Argued January 5, 2022 – Decided February 22, 2022

Before Judges Whipple, Geiger, and Susswein.

On appeal from the Superior Court of New Jersey, Chancery Division, Essex County, Docket No. C-000129-16.

Jason S. Nunnermacker argued the cause for appellant/cross-respondent (Guaglardi & Meliti, LLP, attorneys; Jason S. Nunnermacker, on the briefs).

Jan Alan Brody argued the cause for respondents/cross-appellants (Carella, Byrne, Cecchi, Olstein, Brody & Agnello, PC, attorneys; Jan Alan Brody, on the briefs).

PER CURIAM

Defendant, Vladimir Boukhover, appeals, and plaintiff, Gregory Shapiro, cross-appeals, the Chancery Division's August 27, 2019 order. For the reasons set forth in Judge Jodi Lee Alper's written decision accompanying the order and herein, we affirm the order and resulting judgments.

We summarize a lengthy record. Plaintiff Evergreen Realty Management LLC (Evergreen) is a real estate holding company for 134 Evergreen Place in East Orange, New Jersey, a nine-story commercial building that Evergreen purchased at a sheriff's sale in September 2012 for approximately $1.4 million.

Evergreen's four original members were Vladimir Boukhover, who owned forty percent of the company, Leo Burd, with twenty percent, Eugeny

Klyachman, with ten percent, and Sergei Dobroskok,[1] with thirty percent. Boukhover managed Evergreen's day-to-day business.

In April 2013, Boukhover approached Shapiro about purchasing Dobroskok's thirty-percent interest in Evergreen. In June 2013, Shapiro and the four members entered into a buy-out agreement allowing Shapiro to acquire Dobroskok's shares. Shapiro agreed to pay $480,000 for Dobroskok's thirty-percent interest, to pay for his share of all company expenses commencing June 15, 2013, and to help Boukhover manage the company. All of Shapiro's negotiations were with Boukhover. Jay I. Lazerowitz, an attorney who handled Evergreen's matters and Boukhover's personal matters, drafted the Dobroskok 2015 buy-out agreement.

In early 2015, Boukhover told Shapiro that he, Burd, and Klyachman wanted to sell their interests in Evergreen. Shapiro decided to buy Evergreen himself and discussed this with Boukhover. Shapiro asserts that he and Boukhover agreed on the purchase price for the interests as follows: $800,000 for Boukhover's, $400,000 for Burd's, and $200,000 for Klyachman's.

---

[1] We used the spelling "Dobroskok," which appears in the trial court's opinion. Other spellings appear in the record, including, "Dobroskov," "Dobroscope," "DeBroskoff," and "Barashkov."

A-0566-19

Shapiro applied to Valley National Bank for a first mortgage of $2.1 million and a credit line second mortgage of $300,000 for repairs, maintenance, and improvements. In late September or early October 2015, Valley National Bank asked Shapiro to provide documentation of the buy-out amounts for the shares of his three partners. Shapiro told Lazerowitz that Valley National Bank needed to see buy-outs, and he instructed Lazerowitz to prepare this with $800,000 for Boukhover's interests, $400,000 for Burd's, and $200,000 for Klyachman's. Lazerowitz prepared a draft buy-out agreement dated "October ___, 2015" for each of the three members in the designated amounts. Ultimately, Shapiro did not accept the loan from Valley National Bank.

Shapiro turned to Bank of Princeton for financing, working with Richard Livingston, a commercial loan officer. Shapiro told Livingston that, in addition to $300,000 for building improvement, he was seeking a $2.1 million mortgage, $1.4 million of which would go to buy out his partners and the rest of which would go to other debts. Livingston's trial testimony confirmed Shapiro's contention.

On December 11, 2015, Bank of Princeton provided Shapiro with a loan commitment for the requested $2.1 million mortgage to Evergreen. The

4

document indicated that the purpose of the $2.1 million was to buy out the partners and refinance the real property. Bank of Princeton also provided a $300,000 credit line second mortgage commitment for repairs and improvements. Shapiro was to personally guarantee both loans. Shapiro called Lazerowitz to tell him about the loan commitments and to prepare the necessary documents for closing.

At the end of December 2015, Shapiro met with Burd, Klyachman, and Boukhover. Shapiro asserts he confirmed with each of them the buy-out amounts they would be paid: $800,000 for Boukhover, $400,000 for Burd, and $200,000 for Klyachman. In January 2016, Boukhover told Shapiro that the others agreed to receive five percent less—if they were paid immediately—with $190,000 to Klyachman and $380,000 to Burd. Shapiro told Lazerowitz to prepare the necessary documents.

Lazerowitz prepared the two-page "Original Membership Interest Surrender & Resignation Agreement," dated January 25, 2016, to reflect Shapiro's buy-outs of the other members. The original surrender agreement included each member's percentage share and that each surrendered his membership effective on the date of the agreement, but it did not include the buy-out amounts for each partner.

5

Shapiro asked Boukhover to get the original surrender agreement from Lazerowitz, sign it, and have the other partners sign it, all of which he did. Shapiro went to Boukhover's apartment to pick up the executed original surrender agreement, and Boukhover signed it in his presence. Shapiro then took the document back to his own apartment and signed it. Shapiro emailed a copy of the original surrender agreement to Lazerowitz to forward to the bank, and he retained the original.

On February 17, 2016, the morning of the closing, Lazerowitz called Shapiro to say that Bank of Princeton required the purchase amount in the buy-out agreement. Lazerowitz had the draft original surrender agreement open on his computer, and he redrafted the first page of the agreement and put in the numbers Shapiro had given him. Lazerowitz later testified that there had never been any dispute about the amounts. Lazerowitz created a new first page to the two-page original surrender agreement and used the existing signature page.

At the closing, Shapiro gave Lazerowitz the original surrender agreement. Lazerowitz unstapled it and took out the first page and replaced it with the other page he prepared with the numbers Shapiro had given him that

6

A-0566-19

morning. He then made a copy and restapled it (hereinafter the "altered surrender agreement").

The relevant paragraphs of the first page of the original surrender agreement stated:

> 1. Vladimir Boukhover hereby surrenders his membership interest effective on the date of this Agreement.
>
> 2. Eugeny Klyachman hereby surrenders his membership interest effective on the date of this Agreement.
>
> 3. Leo Burd hereby surrenders his membership interest effective on the date of this Agreement.

In the altered surrender agreement, those paragraphs stated:

> 1. Vladimir Boukhover hereby surrenders and assigns his membership interest to Gregory Shapiro for the sum of $800,000 effective on the date of this Agreement. No membership certificates were issued.
>
> 2. Eugeny Klyachman hereby surrenders and assigns his membership interest to Gregory Shapiro for the sum of $190,000 effective on the date of this Agreement. No membership certificates were issued.
>
> 3. Leo Burd hereby surrenders and assigns his membership interest to Gregory Shapiro for the sum of $380,000 effective on the date of this Agreement. No membership certificates were issued.

7

The Bank of Princeton loans closed, and $2,373,434.79 was wired into Lazerowitz's business account. Lazerowitz was supposed to pay off the partners and some other fees and costs, and then distribute the remaining funds to Evergreen's business account.

Unbeknownst to Shapiro and everyone else at the closing, Lazerowitz was suspended from the practice of law three weeks earlier. The closing funds were deposited into his business account because his attorney trust account was already frozen. His business account was frozen a few days later.

In the weeks that followed, Shapiro attempted unsuccessfully to get Lazerowitz to distribute the closing funds. On March 22, 2016, Shapiro emailed Lazerowitz, stating in pertinent part:

> According to Membership Interest & Registration Agreement (attached) the payout for the members to be as follow[s]:
>
> Boukhover $800,000
> Klyachman $190,000
> Burd $380,000
> The broker was paid $12,000
>
> The remaining balance from my mortgage [is] $1,105,994 to be given to me.

He added, "[i]f I do not receive all my money by the end of this week I have no choice but [to] turn to the authorit[ies]."

8

A-0566-19

At some point in March 2016, Shapiro had a meeting with Burd, where he learned that Boukhover wanted $1.5 million rather than $800,000 for his shares. On the morning of March 24, 2016, Shapiro emailed Lazerowitz, in pertinent part:

> Jay
>
> I consulted with my accountant and my attorney. They advised me as follows:
>
> I hired you as a closing attorney and you cannot represent Boukhover, this is [a] conflict of interest.
>
> You have no authority to hold my mortgage money. All the money $2,373,434.79 minus $12,000 you disbursed to broker shall be immediately transfer[red] to my company account.
>
> All the disbursement to the members and taxes they owe sh[a]ll be drawn from that account.

Shapiro directed the transfer of the money to a Bank of America account. He stated that if he did not receive the money, he would have "no choice but to hire the third-party attorney to start investigat[ing] this matter and contact the Bank of Princeton and New Jersey State Ethic[s] Commission."

That evening, Lazerowitz responded:

> As I am sure you've been told, there are conflicting claims to the amounts to be paid. [Boukhover] has advised me not to allow distribution of funds. You have asked for distribution of funds. I cannot take

9

sides and distribute funds while this dispute is ongoing. If this is not being worked out, [Boukhover] will retain [a] [l]awyer as you will and the [c]ourt will decide.

This was the first time Lazerowitz informed Shapiro that a dispute about conflicting amounts was preventing distribution. Boukhover asserted that when he executed the original surrender agreement in his apartment on January 25, 2016, Shapiro also presented another document drafted by Lazerowitz that he and Shapiro both signed and Shapiro took possession of the only copy of both executed documents.

On June 9, 2016, Shapiro filed a verified complaint against Boukhover, Burd, Klyachman, Lazerowitz, and Evergreen as interested parties asserting claims for breach of contract, to enforce the surrender agreement, and to distribute the funds in Lazerowitz's trust account. Boukhover filed counterclaims against Shapiro for breach of contract, promissory estoppel, legal fraud, equitable fraud, reformation, and rescission. Boukhover also filed a cross-claim against Lazerowitz for constructive trust and declaratory judgment. Both later filed more expansive amended pleadings. Burd and Klyachman each filed counterclaims against Shapiro for breach of contract and promissory estoppel and cross-claims against Lazerowitz for breach of contract and legal malpractice.

10

Boukhover moved to appoint a custodial receiver or a fiscal agent for Evergreen, which the court denied without prejudice on the record on November 4, 2016, without a written order.[2]  On March 27, 2017, Boukhover

---

[2]  $2,373,434.79 of the funds in Lazerowitz's frozen law firm account were "restrained from disbursement and transferred to the Superior Court Clerk" by orders of the Supreme Court filed on January 27 and December 14, 2016.  The funds "together with accrued interest," were released to a custodial receiver of Lazerowitz's estate by order dated March 9, 2017.

On April 13, 2017, the court ordered the receiver to "immediately deliver to plaintiffs Evergreen Realty Management, LLC, and Gregory Shapiro the sum of $273,434.79 in a check made payable to 'Evergreen Realty Management, LLC' from the funds he is holding in escrow pursuant to the Supreme Court's March 9, 2017 order and Judge Mizdol's December 23, 2016 order."  This order was evidently not executed, as the funds remained in the receiver's custody until distributed by later consent orders.

On May 16, 2017, a consent order (1) directing the receiver to pay settlement amounts of $400,000 to Burd and $200,000 to Klyachman "from the funds the [r]eceiver is holding in escrow pursuant to the Supreme Court's March 9, 2017 order and Judge Mizdol's December 23, 2016 order," (2) dismissing with prejudice all claims by and against Burd and Klyachman, and (3) providing that Burd and Klyachman "are no longer parties in this matter." The receiver paid the designated settlement amounts.  On October 10, 2019, the court entered a consent order noting that "the balance of the Evergreen mortgage refinance closing proceeds . . . are currently being held in escrow . . . in an interest[-]bearing escrow account" and authorizing full disbursement of the funds.  The "Buyout Payment due from Shapiro to or on behalf of Boukhover" in the final distribution order totaled $870,528.99, including interest, and was comprised of (1) $232,000 previously released, (2) $425,000 paid to Boukhover's ex-wife's attorney in connection with a matrimonial settlement agreement, and (3) "$143,000, plus interest from January 25, 2016 to September 30, 2019 in the amount of $70,528.99, for a total of $213,528.99

---

11

filed a request to enter default against Lazerowitz for failure to plead or defend.[3]  On May 16, 2017, all claims by and against Burd and Klyachman were dismissed with prejudice.

The court entered judgment and issued a written opinion on August 27, 2019, following a bench trial over twelve days.  Judge Alper heard testimony from Shapiro, Livingston, Boukhover, Lazerowitz, and Alona Magidova, the attorney who represented Boukhover's wife in their divorce proceeding.

The court found Shapiro to be credible, overall.  The court found Livingston to be credible and inherently believable and Magidova to be "forthright in her testimony with no perceptible reason to embellish the facts."

By contrast, the court found Boukhover's testimony completely incredible.  "He exhibited angry, evasive responses to questions," made many

_____

plus per diem interest of $54.47 per day for each day thereafter until paid in full."

The final distribution order further provided that "the remaining balance of the [e]scrow [f]unds," as well as "the remaining accrued interest" be distributed to Shapiro's counsel.

[3]  Notwithstanding his suspension in January 2016, Lazerowitz continued to practice law until September 2016, when he was arrested for practicing law without a license and conversion of client funds.  Lazerowitz was jailed following a guilty plea entered on August 22, 2017, and he was sentenced on October 5, 2018, to imprisonment for three years.  He was incarcerated at the time of trial in 2019.  Lazerowitz was disbarred by consent as of September 18, 2017.

statements that were shown by the evidence to be incorrect, and "frequently displayed outbursts when cross-examined about his finances." "His demeanor was flippant and dismissive. His 'responses' to cross-examination questions were not responses at all, but extended self-serving statements, notwithstanding frequent admonitions by the court." The inconsistencies in his testimony were "too voluminous to cite." Similarly, the court found Lazerowitz's testimony to be inconsistent and unbelievable.

Judge Alper explained that "[a]t the heart of this dispute is the amount that Shapiro was to pay Boukhover for his [forty percent] interest," stating:

> Notably, there is no dispute between Shapiro and Boukhover that they had an agreement for the buyout. The only question is what amount Shapiro was to pay Boukhover for his interest.

The court also noted that Shapiro sought damages from Boukhover for his "alleged wrongful conduct as the manager of Evergreen," and Boukhover alleged that "he has been an 'oppressed' member of Evergreen."

The court found that Boukhover, Burd, and Klyachman "each surrendered his membership interests in and resigned as managers of Evergreen" on January 25, 2016, by signing the original surrender agreement. Further, "[t]hrough the agreement, each of the surrendering members also

13

A-0566-19

waived their claims to any financial distributions."  Thus, "Shapiro became the sole member of Evergreen as of January 25, 2016."

The court explained that "there is no signed agreement between Shapiro and Boukhover in evidence that established the buyout amount for the interest of Boukhover as $800,000, $1,500,000 or any other amount."  It noted:

> In the absence of a written and signed agreement between Boukhover and Shapiro relating to the purchase of Boukhover's Evergreen interest, the court is left to the ancillary documents and testimony of the witnesses to determine whether they had actually agreed on a buyout amount for Boukhover's interests as they both allege, and, if so, what the amount was.

Viewing the documentary evidence and considering the credible testimony, the court found that the proofs "establish[ed] that Boukhover agreed to sell his Evergreen interest for $800,000."

The court noted that the "independent testimony" of both Livingston and Magidova supported the conclusion that the agreed-upon buy-out price was $800,000.  In particular, the court found Livingston's testimony "that Boukhover himself admitted to Livingston that he had agreed to the $800,000 amount" compelling.  Further:

> The court [found] equally compelling the email exchange between Shapiro and Lazerowitz after the closing of the Bank of Princeton loan.  In that exchange on March 22, 2016, Lazerowitz confirmed to

14

> Shapiro that Shapiro is "correct" that the buyout amount for Boukhover was $800,000.

The court did not credit Boukhover's claim that the parties had ever signed the draft $1.5 million buy-out agreement and rejected "Boukhover's assertion that Shapiro misled him regarding the purchase price of his interest in Evergreen and in 'conspiring' with Lazerowitz" to do so.

Regarding Shapiro's claim against Boukhover for mismanagement, the court "d[id] not find sufficient evidence to sustain the claim." Similarly, the court found "no basis for the claim of Boukhover that he has been an 'oppressed' member of Evergreen and 'frozen out' of the [c]ompany's operations by Shapiro." The court noted that there was "no evidence" that "either Shapiro or Boukhover accused the other of mismanagement, oppression, or any other wrongdoing" related to Evergreen before the Princeton Bank loan closing in February 2016.

Finally, the court dismissed both Shapiro's and Boukhover's legal malpractice claims against Lazerowitz, explaining:

> Both parties assert claims against Lazerowitz including malpractice and breach of contract. On its face, negligence occurred, including the failure of Lazerowitz to advise the parties of the suspension of his law license and his continued representation of them thereafter; his deposit of mortgage proceeds into his attorney business account; and his failure to

15

> distribute the mortgage loan. However, the court does not have before it the specific nature of the negligence alleged by the parties and relief requested including, but not limited to, the value of the alleged damages.

On August 27, 2019, the trial court entered final judgment (1) declaring that Boukhover must sell his forty-percent interest in Evergreen to Shapiro for $800,000, (2) ordering Shapiro to pay interest on the $800,000, (3) deeming Boukhover's forty-percent interest surrendered as of January 25, 2016, and (4) dismissing all other claims and counterclaims with prejudice. Boukhover appealed, and Shapiro cross-appealed.

## I.

### Boukhover's Appeal

Boukhover argues that the trial court erred in failing to rescind "the Surrender Agreement and the Altered Surrender Agreement" as a remedy for "the inequitable conduct by Shapiro" and that it should have implemented one of "several equitable options" he proposed. Specifically, he contends that the court should have (a) dissolved Evergreen and ordered a sale of the property, with the proceeds split fifty-fifty between Boukhover and Shapiro, (b) split ownership of Evergreen equally between Boukhover and Shapiro and appointed a property manager to operate the building, or (c) determined fair market value for the property and allowed him or Shapiro to buy out the other's

16

interest in the company for fifty percent of that number. His arguments have no merit.

Boukhover's arguments inaccurately assume that the trial court found the altered surrender agreement to be a binding contract. However, the court expressly found that there was "no signed agreement between Shapiro and Boukhover in evidence that established the buyout amount," and it relied on evidence wholly distinct from the altered surrender agreement for its finding that the agreed-upon price was $800,000.

The court did find the original surrender agreement, pursuant to which Boukhover relinquished all interest in Evergreen in January 2016, valid and enforceable and Shapiro and Boukhover did not dispute "that they had an agreement for the buyout," which was established by both their testimony. Boukhover effectively asks us to grant rescission of only the original surrender agreement, an agreement that he notes in his brief that "[a]ll parties concede . . . was knowingly signed."

More fundamentally, Boukhover's several arguments in this point all ignore two critical facts found by the trial court, namely that (1) Boukhover voluntarily relinquished all ownership and management interest in Evergreen in January 2016 when he signed the original surrender agreement, and (2)

17

Shapiro and Boukhover agreed on the buy-out amount of $800,000.  Similarly, his arguments all assume a fact that the trial court specifically held that Boukhover failed to establish, namely that Shapiro's conduct was improper or inequitable.

"Findings by the trial judge are considered binding on appeal when supported by adequate, substantial and credible evidence."  Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974).  Here, there is sufficient credible evidence in the record to support the trial court's findings that Boukhover voluntarily relinquished his interest in Evergreen and agreed to be paid $800,000 to do so.  Rather than allow for the deference required by the appropriate standard of review, Boukhover asks us to re-weigh the evidence and re-find the facts regarding his agreement and price.

Similarly, Boukhover's arguments are premised on facts the trial court specifically refused to find because evidence of such lacked credence, including that (1) Shapiro engaged in inequitable conduct; (2) it was always Shapiro's and Boukhover's intention that Boukhover would remain an Evergreen member; (3) Lazerowitz's testimony regarding the draft $1.5 million buy-out agreement should have been believed; and (4) Boukhover had been harmed by Shapiro's and the Evergreen's wrongful, oppressive behavior as to

18

the purchase price of his interest. "The trial court's factual findings based upon matters of credibility should not be disturbed unless they result in a denial of justice." W.W. v. I.M., 231 N.J. Super. 495, 511 (App. Div. 1989) (citing Rova Farms, 65 N.J. at 483-84). Here, Boukhover provides no basis to disturb the trial court's credibility findings.

Boukhover further contends that "this matter is directly analogous to the Bonnco Petrol matter," referencing Bonnco Petrol, Inc. v. Epstein, 115 N.J. 599 (1989). We disagree. That case stands for the proposition that a party to an oral agreement who "entrusts the other with the obligation of reducing it to writing" has a right to assume that the written agreement will accurately reflect their "oral understanding." Bonnco Petrol, 115 N.J. at 611 (quoting Peter W. Kero, Inc. v. Terminal Const. Corp., 6 N.J. 361, 369 (1951)). Here, Boukhover's reliance on Bonnco Petrol is grounded on the premise that the trial court should have believed Boukhover's and Lazerowitz's trial testimony instead of Shapiro's and Livingston's. Again, this asks us to re-weigh the evidence and re-find the facts, but Boukhover provides us with no legitimate basis to do so.

His remaining arguments are also premised on facts Judge Alper did not accept. We find no error in her finding that the parties did not agree to the $1.5 million purchase price Boukhover claimed.

We also reject Boukhover's argument that the trial court's refusal to admit letters of intent to purchase the property "was clear error" because the value of the property was "entirely relevant" and the letters were "a bona fide third party offer to purchase" that the court was obligated to consider. At trial, Boukhover sought to introduce single-page letters dated November 20, 2018, and January 14, 2019, each from Ibrahim Hasan of Blackstone 360 LLC to Boukhover, and testimony regarding the letters. Each letter purported to be a "non-binding letter of intent to purchase" the property for $6 million by "Blackstone 360 LLC or assignee affiliated with S. Airaj Hasan" and stated, in pertinent part:

> This proposal is intended merely as a preliminary expression of general intentions. The parties mutually intend that neither shall have any binding contractual obligation to the other with respect to the matters referenced herein unless and until a formal written contract has been prepared with adequate opportunity to be reviewed by legal counsel and has been fully executed and delivered by the parties.

The trial court denied Boukhover's motion to admit the letters of intent and testimony regarding them, stating:

20

> The [c]ourt knows of no precedent for a [c]ourt to permit a letter of intent as proof of value. In fact, to the contrary, it's the [c]ourt's understanding that a letter of intent or an offer to purchase is not at all evidential.

The court also noted:

> The parties both had the opportunity – this case has been going on since 2016 and there has been no expert offered to opine regarding the value of the entity and of the shares. The [c]ourt will not now, at trial, after this number of years, permit either party to rely on an offer as some evidence of value.

We review a trial court's evidentiary rulings for abuse of discretion. Rulings admitting or excluding evidence should be upheld unless "there has been a clear error of judgment." State v. J.A.C., 210 N.J. 281, 295 (2012) (quoting State v. Brown, 170 N.J. 138, 147 (2001)). We will not substitute our judgment for that of the trial court "unless the evidentiary ruling 'was so wide of the mark that a manifest denial of justice resulted.'" State v. Perry, 225 N.J. 222, 232 (2016) (quoting State v. Marrero, 148 N.J. 469, 484 (1997)).

We discern no abuse of the court's discretion particularly in light of the court's thorough discussion and analysis of New Jersey Turnpike Authority v. Bowley, 27 N.J. 549 (1958), Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 281 (App. Div. 1998), and Linwood Properties, Inc. v. Borough of Fort Lee, 7 N.J. Tax 320 (Tax 1985), which are dispositive on the issue.

21

We also reject Boukhover's contention that the court erred in denying his motion to appoint a receiver, or alternatively a fiscal agent, for Evergreen in November 2016. As to the initial request, "a court of equity has inherent power in a proper case to appoint a receiver for a corporation on the ground of gross or fraudulent mismanagement by corporate officers or gross abuse of trust or general dereliction of duty." Roach v. Margulies, 42 N.J. Super. 243, 245 (App. Div. 1956). "However, such drastic action is avoided where possible, and if the relief necessary can be accomplished by some less onerous expedient." Ibid. See also Ravin, Sarasohn, Cook, Baumgarten, Fisch & Rosen, PC v. Lowenstein Sandler, PC, 365 N.J. Super. 241, 249 (App. Div. 2003) (noting that custodial receiverships are "a device for courts of equity, which should look to them only as a last resort").

The court can, instead, take "the less 'drastic action' and 'less onerous expedient' of appointing a special fiscal agent." N.J. Realty Concepts, LLC v. Mavroudis, 435 N.J. Super. 118, 125 (App. Div. 2014) (quoting Roach, 42 N.J. Super. at 245). "[T]he appointment of a 'special fiscal agent' to oversee the disbursements of a solvent corporation" is recognized "as a 'pendente lite device . . . contrived to avoid more stringent measures.'" Kassover v.

Kassover, 312 N.J. Super. 96, 100-01 (App. Div. 1998) (quoting Roach, 42 N.J. Super. at 246).

Thus, "the Chancery Division has discretion in appointing a receiver or special fiscal agent." N.J. Realty Concepts, LLC, 435 N.J. Super. at 123. In denying Boukhover's motion to appoint a receiver, the court exercised what we discern to be thoughtful discretion holding that appointing a receiver "should be avoided where possible and when the relief can be afforded by lesser means," and

> [c]ertainly on this record defendant has not met [its] burden . . . of showing that a custodial receiver or a special fiscal agent is necessary. And I appreciate the concern that they have been shut out and I'm not neglecting that.

The court was also concerned about the typically high potential cost to the company in appointing a special fiscal agent.

The court permitted Boukhover's and the other partners' discovery regarding Evergreen's ongoing financial concerns. It explained that the parties were "free to come back to me after they review that" with evidence "instead of just the bald allegations" presented at that point and renew the motion for a receiver or special fiscal agent. Nothing in the record suggests that Boukhover filed another motion for this relief at any point.

23

II.

Claims against Lazerowitz

The trial court dismissed both Boukhover's and Shapiro's claims for legal malpractice against Lazerowitz, notwithstanding its finding that "negligence occurred," because "the court does not have before it the specific nature of the negligence alleged by these parties and relief requested including, but not limited to, the value of the alleged damages." We find no error in the trial court's dismissals.

Boukhover argues that the trial court erred in "summarily dismissing the claim against Lazerowitz, despite the entry of default, as such claim did not actually accrue until the [t]rial [c]ourt reached a decision on the underlying dispute as to the purchase price of Boukhover's [i]nterest." He acknowledges that the trial court "determined that amount to be $800,000," but he points to Lazerowitz's testimony that "the agreement for Boukhover's [i]nterest was $1.5 million" and argues that his "malpractice claim now has ripened against Lazerowitz in the amount of at least $700,000."

This argument fails for the same reasons Boukhover's other arguments fail because they require us to reject the trial court's fact and credibility findings and substitute with ones he prefers. The trial court found as a fact

24

that the parties did not agree to a $1.5 million buy-out amount, so Boukhover cannot establish damages for legal malpractice based on the claim that he ought to have received $1.5 million for his interest in Evergreen.

"[P]roximate causation of the damages claimed" is a required element of a legal malpractice claim. Innes v. Marzano-Lesnevich, 435 N.J. Super. 198, 212 (App. Div. 2014), aff'd as modified, 224 N.J. 584 (2016). A claimant "must show by a preponderance of the evidence what injuries he suffered as a proximate consequence of the attorney's breach of duty." Gautam v. De Luca, 215 N.J. Super. 388, 397 (App. Div. 1987). "In that context, the measure of damages is ordinarily the amount that the client would have received but for his attorney's negligence." Ibid. Here, Boukhover was entitled to $800,000, which he received, and Lazerowitz's negligence did not alter that.

Shapiro argues that the court erred in holding that it could not determine "the value of the alleged damages" on his malpractice claim because "plaintiffs' damages consisted of three components: (i) their loss of the benefit and use of the closing proceeds in the form of prejudgment interest; and (ii) their loss of the [five percent] discounts from Burd and Klyachman for prompt lump sum payments; and (iii) their counsel fees incurred in this action."

25

The court found that "negligence occurred, including the failure of Lazerowitz to advise the parties of the suspension of his law license and his continued representation of them thereafter; his deposit of mortgage proceeds into his attorney business account; and his failure to distribute the mortgage loan," but it found that it did not have "the value of the alleged damages" caused by that negligence before it. Shapiro's claim that he established the value of three categories of damages does not bear close scrutiny.

First, he contends that he lost "the benefit and use of the closing proceeds in the form of prejudgment interest." The record shows, however, that the closing proceeds were kept in interest-bearing accounts most, if not all, of the time they were frozen, and Shapiro received that interest when the distribution of funds was eventually made. The record does not reveal the amount of interest he received, either in percent or dollar form, and it is possible that it was less than the prejudgment interest rule would have allowed. However, the onus was on Shapiro to establish those numbers on the record if he wished to claim loss of prejudgment interest as an element of legal malpractice damages. He did not do so.

Second, he contends that Lazerowitz's negligence caused the loss of the $30,000 he would have obtained from "[five percent] discounts from Burd and

A-0566-19

Klyachman for prompt lump sum payments." Although this category includes a quantifiable "value" for the alleged damages, Shapiro's argument fails because the trial court did not find that either Burd or Klyachman actually agreed to a prompt-payment discount, and the record does not support such a finding.

In his amended complaint, Shapiro alleged that "[t]he agreed upon purchase price for Burd's Evergreen membership interest was $380,000. The agreed upon purchase price for Klyachman's Evergreen membership interest was $190,000." However, both Burd and Klyachman denied this allegation in their answers, asserting that Burd's price was $400,000 and Klyachman's $200,000. Boukhover also denied the allegation in his answer. At trial, Shapiro acknowledged that his own belief that Burd and Klyachman had agreed to a five-percent prompt-payment discount came from a representation by Boukhover, not from direct contact with either of the other members. Thus, the only fact in evidence supporting the alleged $30,000 discount was the hearsay statement of a person whose credibility was in serious doubt.

Third, Shapiro contends that "counsel fees incurred in this action" should have been counted as malpractice damages. His argument lacks merit. In Saffer v. Willoughby, 143 N.J. 256, 272 (1996), our Supreme Court held

27

that "a negligent attorney is responsible for the reasonable legal expenses and attorney fees incurred by a former client in prosecuting the legal malpractice action" because "[t]hose are consequential damages that are proximately related to the malpractice."

Here, Shapiro implicitly contends that, under this precedent, he is entitled to attorneys' fees incurred both in litigating his malpractice claim against Lazerowitz and in his other, third-party claims against Boukhover. However, he has failed to establish that he is entitled to either category of attorneys' fees as consequential damages.

As discussed above, putting the costs of litigating a malpractice claim aside, Shapiro failed to establish that the negligence the trial court attributed to Lazerowitz proximately caused him any damages. In these circumstances, Shapiro cannot reasonably be said to be "a prevailing plaintiff in a legal malpractice action." Delaney v. Dickey, 244 N.J. 466, 493 (2020). In essence, he had no malpractice-related damages prior to suing Lazerowitz, so allowing him to recover attorneys' fees for the malpractice suit would be allowing him to create his own consequential damages to establish that element of his claim.

Similarly, Shapiro's litigation with Boukhover cannot be deemed to be the proximate result of Lazerowitz's malpractice because Lazerowitz did not

28

create the dispute regarding the purchase price of Boukhover's interest. Shapiro appears to assume that the litigation would not have occurred if only Lazerowitz had timely distributed the loan proceeds, but there is no basis to assume that is the case. Indeed, Boukhover's testimony and general attitude at trial suggest that litigation of the price dispute was inevitable, regardless of any actions or inactions by Lazerowitz.

In sum, Lazerowitz may have been negligent, but without a clear link between that negligence and Shapiro's harm, no malpractice claim exists. "Even though there is beyond all possible doubt negligence in the air, it is still necessary to bring it home to the defendant." Brown v. Racquet Club of Bricktown, 95 N.J. 280, 290 (1984) (quoting W. Prosser, Law of Torts, § 39 at 218 (4th ed. 1971)).

## III.
### Prejudgment Interest and Litigation Costs

In his cross-appeal, Shapiro argues that the trial court erred in awarding Boukhover prejudgment interest on the $800,000 buy-out amount from January 25, 2016, until it was ultimately distributed in October 2019 because Boukhover's own conduct prevented distribution of the $800,000 to him in February 2016 before Lazerowitz's account was frozen and again in March

2017 when the funds were released by the Supreme Court to the receiver. We discern no error.

As our Supreme Court has explained:

> The "equitable purpose of prejudgment interest is to compensate a party for lost earnings on a sum of money to which it was entitled, but which has been retained by another." Sulcov v. 2100 Linwood Owners, Inc., 303 N.J. Super. 13, 39 (App. Div. 1997) . . . ; see also, Pressler, Current N.J. Court Rules, cmt. 8 on R. 4:42-11 ("[P]rejudgment interest is not a penalty but rather its allowance simply recognizes that until the judgment is entered and paid, the defendant has had the use of money rightfully the plaintiff's.").
>
> [N. Bergen Rex Transp., Inc. v. Trailer Leasing Co., 158 N.J. 561, 574-75 (1999).]

"[I]n contract actions, prejudgment interest is assessed on a discretionary basis as the result of the application of equitable principles." DialAmerica Mktg., Inc. v. KeySpan Energy Corp., 374 N.J. Super. 502, 508 (App. Div. 2005) (citing N. Bergen Rex Transp., Inc., 158 N.J. at 575). "Similarly, the rate at which prejudgment interest is calculated is within the discretion of the court." Litton Indus., Inc. v. IMO Indus., Inc., 200 N.J. 372, 390 (2009). Absent "a manifest denial of justice," an appellate court should not disturb an award of prejudgment interest on a contract claim. Ibid. (citing C'ty of Essex v. First Union Nat'l Bank, 186 N.J. 46, 61 (2006)).

Shapiro argues that the equitable purpose of allowing prejudgment interest in a contract matter was not served in this case "because Shapiro and Evergreen did not have possession and use of Boukhover's $800,000" from January 2015 until October 2019, and it was Boukhover's "conduct that resulted in the freezing of the closing proceeds and his deprivation of the $800,000;" thus, Boukhover should not have been granted any interest.

Although it is true that Boukhover's $800,000 was never in Shapiro's or Evergreen's possession, it is undisputed that Boukhover was entitled to the money but did not have use of it until the conclusion of the case. It is also undisputed, as noted above, that the closing proceeds, including the $800,000 portion belonging to Boukhover, were held in interest-bearing accounts during the pendency of the litigation. Paying Boukhover $800,000 without any interest would have resulted in Shapiro receiving and retaining the interest that had accrued for years on money that admittedly did not belong to Shapiro. Thus, allowing Boukhover to receive the interest accrued on his money as well as the principal was an equitable solution well within the trial court's discretion.

Finally, Shapiro argues that the trial court erred by not awarding him "counsel fees and costs" under N.J.S.A. 42:2C-48(c) due to "Boukhover's

A-0566-19

vexatious and bad faith conduct after Shapiro became the manager when Boukhover wrongfully denied that the [a]greed [u]pon [p]rice was $800,000, resulting in this costly litigation, the freezing of the closing proceeds, and plaintiffs' loss of the benefit and use of the closing proceeds for over three years." We find no merit in Shapiro's argument.

It is not entirely clear that N.J.S.A. 42:2C-48(c) gave the court authority to award attorneys' fees in this case, but even if it did, declining to make such an award was entirely within the court's discretion. Where a fee award is permitted, the decision to award or deny attorneys' fees rests within the sound discretion of the trial court. Rendine v. Pantzer, 141 N.J. 292, 317 (1995); see also Passaic Valley Sewerage Comm'rs v. St. Paul Fire & Marine Ins. Co., 206 N.J. 596, 619 (2011) (explaining that an award of counsel fees "is not mandatory," but is subject to the "broad discretion" of the trial court); Packard-Bamberger & Co. v. Collier, 167 N.J. 427, 443-44 (2001) (noting the "clear abuse of discretion" standard of review); Enright v. Lubow, 215 N.J. Super. 306, 313 (App. Div. 1987) (noting that "[t]he trial judge has broad discretion as to when, where and under what circumstances counsel fees may be proper").

A-0566-19

Here, Shapiro has not made a persuasive argument that the trial court had authority to make an attorneys' fee award under N.J.S.A. 42:2C-48(c), much less that it abused its discretion by failing to make such an award.

To the extent we have not addressed defendant's or plaintiff's remaining arguments, we are satisfied they are without sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION